## GOULD *v.* STAPLES.

*(Circuit Court, D. Maine.* September 5, 1881.)

1. ADMIRALTY—CONSULAR AGENTS—CONSULS.

Under the provisions of the statutes and established regulations, a consular agent is the representative of the consul to whom he is subordinate.

2. SAME—REV. ST. § 4309.

An arrival at a foreign port from another foreign port is within the purview of section 4309 of the Revised Statutes.

3. SAME—CONSULAR REGULATIONS OF MAY 1, 1881.

*Semble* that Hieres is not within such reasonable distance of the port of Toulon, and the communication between the two points so free from difficulty, as to require a master, under the provisions of paragraph 179 of the consular regulations of May 1, 1881, on arriving there, to deposit his ship's papers at the Toulon consulate.

*W. F. Lunt,* Dist Atty., for plaintiff.

*H. D. Hadlock,* for defendant.

Fox, D. J. This action is brought by the consul of the United States at the city of Marseilles, France, to recover from the defendant, master of the ship Charter Oak, the penalty of $500 prescribed by the Revised Statutes, § 4310, for not depositing his ship's papers with the consular agent of the United States at Toulon, in December, 1879; the ship having arrived at Hieres, which was "within the consular jurisdiction of the consul of the United States residing at Marseilles, the said consul having a consular agent at Toulon." Hieres is about 20 miles from Toulon; about four miles from the shore, near the head of a bay. There is no harbor at this place, but only an open roadstead with a sandy bottom. There is no representative of the United States at Hieres, the nearest being at Toulon, at which place there is a consular agent who is subordinate to the consul at Marseilles.

The Charter Oak, in September, 1879, sailed from New York to Genoa with a cargo of oil. On the second of December she sailed from Genoa for Hieres, for a homeward cargo of salt, arriving there the next day, but on account of bad weather she did not reach the loading ground till the 5th, when she made fast to the mooring chains. On the twelfth and seventeenth of December the consular agent at Toulon notified the defendant by letter that he must come to that city, and deposit with him at the consulate the ship's papers. These demands were never complied with.

Section 4309 of the Revised Statutes requires of every master of a ship, belonging to citizens of the United States, who shall sail from a port in the United States—

"That he shall, upon his arrival at a foreign port, deposit his register, etc., with the consul, vice-consul, commercial agent, or vice-commercial agent, if any there be at such port. And it shall be the duty of such consul, etc., upon such master producing to him a clearance from the proper officer of the port where his vessel may be, to deliver to such master all of his papers, if he has complied with the provisions of law relating to the discharge of seamen, etc., and to the payment of the fees to the consular officers."

Section 4310 imposes a penalty of $500 upon the master of any such vessel who refuses or neglects to deposit his papers as thus required, the same to be recovered by such consul, in his own name, for the benefit of the United States.

Neither of the officials named in these sections was to be found at either Hieres or Toulon; but at the latter port the consul at Marseilles was represented by an agent, recognized by the laws of the United States. Section 1674 of the Revised Statutes enacts—

"That 'consular agents' shall be deemed to denote 'consular officers' subordinate to their principals, the consuls, exercising the powers and performing the duties within the limits of their consulates   *   *   *   at such ports or places different from those at which such principals are located."

By section 1695 the president is authorized to appoint consular agents in such numbers and under such regulations as he may deem proper. By paragraph 17, consular regulations of 1881, consular agents are described as—

"Acting only as the representatives of their principals, and are subject and subordinate to them, and are paid only by the fees collected by them, retaining the whole or such portion as may be agreed upon between them and their principals, the residue being received by the principal, under the sanction of the president."

From these provisions of the statutes and established regulations, it is manifest that the consular agent of the United States at Toulon was in law a representative of the plaintiff, and that through him the plaintiff was in fact the consul for the port of Toulon, discharging all the duties of a consul at that port as effectually as if there present attending to them in person; and if the Charter Oak had arrived at Toulon her master would have been bound to have deposited his papers at the consulate in that city with the agent of the plaintiff, and on failure so to do would have been liable to the plaintiff for the penalty.

It is objected that the Charter Oak, on her arrival at Hieres, came from the foreign port of Genoa and not from a port in the United States, and that the statute only requires a ship's papers to be deposited with the consul at the first port at which she may arrive after

leaving this country, and that her master is not required to deposit his papers with the consuls at every other foreign port to which she may subsequently proceed. The language of the section is certainly somewhat ambiguous, and is as follows: "Every master, etc., who shall sail from any port in the United States, shall, on his arrival at any foreign port, etc., deposit his papers with the consul." In the opinion of the court this provision of law requires that at every foreign port where the designated officer is to be found, the master, on his arrival, is obliged to deposit with him his ship's papers. Every additional port, subsequent to the first to which he may proceed in the course of the voyage, is an arrival at a foreign port by him. The case is within the letter of the act, and the same reasons which would call for the ship's papers at the first port at which he might arrive would be alike applicable on his arrival at any other port. The case of *Parsons* v. *Hunter*, 2 Sumn. 419, was one similar to the present. There, the ship, on her voyage from Matanzas to London, touched at Cowes, and her master, failing to deposit his papers with the consul at Cowes, this suit was instituted for the penalty. This objection was patent on the record, was of a preliminary nature, and if tenable could not have escaped the attention of so careful and discriminating a judge as was Mr. Justice Story. The defendant in that case prevailed, and the reasons of the learned judge for his decision are set forth in a full and elaborate opinion; but the present objection is not suggested as arising in the cause.

Paragraph 179 of the consular regulations promulgated May 1, 1881, is as follows:

"A vessel arriving within a consular district, although at some port other than that at which the consular office is situated, makes an arrival in such sense as to require a deposit of the vessel's papers, and to subject her to consular jurisdiction, if the port which she actually enters is within reasonable distance from the consulate, and the communication between the two ports is not difficult."

This regulation was not promulgated until after the failure of the defendant to deposit his papers with the consular agent at Toulon, herein complained of, and therefore can have no effect upon the rights of the parties to the present suit. The president is by law empowered to prescribe regulations for consuls; but he has no authority to change or modify the law, and thereby subject a master, who fails to comply with such regulations, to penalties nowhere imposed by any act of congress. Whether paragraph 179 is or not a true con-

struction of the provisions of the act of congress upon this subject, may possibly admit of some doubt; and the same is left for further consideration when it shall be necessary to pass upon it, as, under the circumstances of the present case, in the opinion of the court, the port of Hieres is not within such reasonable distance of the port of Toulon as to require the master of a ship, arriving at Hieres, to deposit his ship's papers at the Toulon consulate. Such a requirement is unreasonable, and would demand of the master a neglect of other duties and impose upon him a burden which a ship-master ought not to be subjected to.

That the ship lay about four miles from the town of Hieres, which is about 20 miles from Toulon, are matters about which there is no controversy. There is some question as to the means of communication between Hieres and Toulon. The consul, in his communication to the department of state, which is admitted as testimony by consent, says "the two places are connected by a railroad line, with four trains running daily, performing the passage within one hour." Whether all these are or not passenger trains is not stated; neither does it distinctly appear that there were four trains each way, but only that there were four trains passing each day between the two places. The master's testimony is that after receiving the notice from the consular agent at Toulon he applied to his consignees and was informed by them "that it was not the practice for American ship-masters arriving at Hieres to leave their papers at the Toulon consulate, and that, as the trains ran, if he went to Toulon he must be absent from his ship all night." That the master acted in good faith and believed the statement of his consignees the court does not question. The burden is on the plaintiff to establish that the consular agent at Toulon was "within reasonable distance, and that communication with him was not difficult."

In *Harrison* v. *Vose*, 9 How. 378, which was an action against a consul similar to the present, the principle is laid down by *Woodbury*, J.,—

"That we must begin the inquiry with the presumption that the defendant is innocent, and that the burden of proof to make out his guilt devolves upon the plaintiff. In the construction of a penal statute it is well settled that all reasonable doubts concerning its meaning ought to operate in favor of the respondent. * * * Where penalties are to be recovered greater fullness of evidence is necessary to make out such a case. The proof must, then, bring the transaction within the spirit as well as the letter of the law, and must usually show a plain breach of both."

—And in the opinion of the court this the plaintiff has failed to do.

The proper place for a master of a ship of the burden of the Charter Oak, when in a foreign port, is on board his ship. His presence is always promotive of obedience and good discipline, and of attention to their duty, by the crew, and he should never be absent therefrom unless the emergency is urgent. More especially was such the duty of the master of this ship, moored in an open roadstead, in the month of December, on the Mediterranean coast, with mooring tackle of a doubtful character. As the master says: "The mooring chains to which he made fast were smaller than the ship's chains, and he distrusted their holding her if a storm should arise." That they were liable to gales while at this anchorage is shown by the log-book, as it recites that on the day of their arrival at Hieres "it was blowing a gale, with rain." The record for the next day is: "Came on with hard gale, and rain much of the time." Some days the weather was fine, and they were employed taking in cargo. December 15th, the log says, "Strong breeze and clear. Large swell. No cargo." December 16th, "No cargo; large swell." December 17th, "No cargo." December 18th, "Fresh easterly gale; clear; no cargo." The master testifies "that with wind from S. E. to E. N. E. they could not land from the ship; that with the light mooring chains he was afraid of being driven on shore; did not dare to leave the ship over night, on account of the danger." Only on two occasions did he go to Hieres. "Went there for funds. Selected the best chances when the wind was to the westward. Was not gone over three hours at either time. On one of these occasions the wind chopped round suddenly, so that on his attempting to go to the ship the surf filled his boat. With the wind from the eastward, lighters could not come off with cargo. With the sudden changes of the wind the ship was in danger."

Situated as the Charter Oak thus was, the court finds that it would have been highly imprudent for the master to have been absent from his ship all night. His first duty was to the ship, her cargo, and his crew, and his absence from her for that length of time would have unjustifiably exposed her to peril and danger. If, in his absence, a violent storm should arise, which not unfrequently happens on that coast, the ship was liable to be driven from her moorings, either on shore or to sea; and in such an emergency the master's presence, with his skill and experience, might have proved of the greatest advantage in protecting the lives of the crew and saving the property in his charge, which otherwise might have become a total loss. If obliged to deposit her papers at the Toulon consulate, the master

must have been absent from his ship two nights—one to leave them, the other to obtain them—and such a requirement, in the opinion of the court, is so unreasonable that it ought not to meet with its sanction and approval.    To use the words of *Woodbury*, J., in *Harrison* v. *Vose*, before cited, p. 383:

. "The requirement would be oppressive in the extreme.   It would embarrass and clog, rather than aid commerce, which last is peculiarly the design· and policy of legislation by the general government on this vital subject."

The interest of commerce and navigation will be greatly promoted by so construing the acts of congress as to encourage a master in remaining on board his ship whenever situated as the Charter Oak was, and he should never be compelled to be absent from her for any considerable time in search of a consulate, at some port other than that at which his ship has arrived, subjecting his owners to unnecessary expense, and the vessel and cargo, upon sudden peril and emergency, to serious consequences which might result from his absence. If any great benefit is supposed to arise from the ship's papers being in the hands of the consul, consular agencies can be established at every port which our ships may visit, as the president is authorized to appoint so many of these officers as he shall deem expedient. Adopting this course, a consulate could be reached by the master without delay or expense.   The provisions of law could then be complied with by him without the great peril and risk which might frequently attend its observance, if the defendant should be held to have violated the law in the present instance.

The defendant is adjudged to be without fault, and is entitled to judgment.