Kenneth H. WARNER et al.,
Plaintiffs, Appellants,

v.

Vernon D. DUNLAP, Chairman and Member of the Rhode Island State Pilotage Commission, et al., Defendants, Appellees.

No. 75–1342.

United States Court of Appeals,
First Circuit.

March 29, 1976.

Martin Malinou, Providence, R. I., for plaintiffs-appellants.

Ronald A. Dwight, Sp. Asst. Atty. Gen. (Julius C. Michaelson, Atty. Gen., on brief), Providence, R. I., for defendants-appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

■ This case presents a single question: whether a Rhode Island statute [1] which requires every foreign vessel and every American vessel under register for foreign trade that traverses Block Island Sound to take on a pilot licensed by the Rhode Island Pilotage Commission is within the scope of 46 U.S.C. § 211 (1970). The latter statute authorizes states to regulate the use of pilots "in the bays, inlets, rivers, harbors, and ports of the United States ." [2] Resolution of the question presented by this appeal turns on a factual determination as to whether Block Island Sound is a "bay" within the meaning of the federal statute.

Each of the plaintiffs is licensed by the state of Connecticut to pilot foreign flag and American registry vessels through Connecticut waters,[3] and earns his living piloting ships into Connecticut ports. This activity necessitates traversing Block Island Sound. In April 1973, the Rhode Island State Pilotage Commission notified Gulf Oil Trading Corporation whose vessels were piloted by plaintiff Warner, that the employment of Warner violated Rhode Island's pilotage law.[4] Plaintiffs Losch and Ball were likewise subject to being held in violation of the law, and all three were thus prevented from serving as pilots on ships involved in international trade.[5] Plaintiffs challenged the validity of the pilotage law, and after disposition of several procedural issues,[6] the district court rejected their claim, holding the Rhode Island law properly authorized by 46 U.S.C. § 211. We affirm.

■ The term "bay" appearing in § 211 is not defined by that statute. However, the term has been subject to judicial definition. It is clear that bays are among those "bodies of water which join the open sea" and are to be distinguished from "interior waters such as lakes and rivers." *United States v. California,* 381 U.S. 139, 162, 85 S.Ct. 1401, 1414, 14 L.Ed.2d 296, 311 (1965). In that case the Supreme Court noted that the definition of such bodies of "inland water" must have an "international content since the outer limits of inland waters . . . determine the Country's international coastline . . . ," 381 U.S. at 162, 85 S.Ct. at 1414, 14 L.Ed.2d at 311, and it accepted a recently ratified treaty, known

---

1. The relevant portions of R.I. Gen. Laws, 1956 (1970 Reenactment) § 46–9.1–1 *et seq.* (1974 Supp.) are set forth in the Appendix.

2. Title 46 U.S.C. § 211 (1970) (codifying the Lighthouse Act of Aug. 7, 1789, ch. 9, § 4, 1 Stat. 54) provides:

 "*State regulation of pilots.*
 Until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively enact for the purpose."

3. Plaintiffs Losch and Ball are also licensed as pilots by the State of New York to pilot vessels within its waters.

4. *See* Appendix at § 46–9.1–10.

5. Because plaintiffs Warner and Losch subsequently were licensed by Rhode Island, defendants contended that the case was moot, *see DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); however, the district court refrained from so deciding since the status of plaintiff Ball remained unchanged. This aspect of the case is not presently before us for review.

6. Plaintiffs had also sought to convene a three-judge court. The district court, in a separate unpublished opinion, denied this request on the ground that plaintiffs' claim dealt solely with an alleged conflict between state and federal statutes. This question is not before us on this appeal.

as the Convention on the Territorial Sea and the Contiguous Zone,[7] as affording the best definition. *Id.* at 165–67, 85 S.Ct. at 1415, 14 L.Ed.2d at 312. Article 7 of this Convention which provides an extensive definition of "bays",[8] permits a 24-mile maximum closing line for the mouths of bays and applies a "semi-circle test" for testing the sufficiency of the water area enclosed. The latter test requires that a bay must comprise at least as much water area within the closing line as would be contained in a semi-circle with a diameter equal to the length of the closing line. Section 3 of Article 7 provides an additional variation on the "semi-circle test": "Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths."

Plaintiffs contend and the defendants concede that under the semi-circle test Block Island Sound[9] does not constitute a bay. The district court found, however, that the Convention's test ought more properly to be applied "to the entire geographical body of water enclosed within lines drawn at the East River in New York City on the west and between Point Judith, Block Island and Montauk on the east." Essentially the area enclosed would include Block Island Sound and Long Island Sound in combination; and this body of water, the court found, would constitute a bay within the meaning of the Convention.[10]

7. The Convention, T.I.A.S., No. 5639, was approved by the Senate, May 26, 1960, 106 Cong. Rec. 1196, and ratified Mar. 24, 1961, 44 State Dept.Bull. 609. *Cf. Missouri v. Holland,* 252 U.S. 416, 432, 40 S.Ct. 382, 383, 64 L.Ed. 641, 647 (1920).

8. The full text of Article 7 is as follows:
 "1. This article relates only to bays the coasts of which belong to a single state [i. e., a single nation].
 "2. For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation.
 "3. For the purpose of measurement, the area of an indentation is that lying between the low-water mark around the shore of the indentation and a line joining the low-water marks of its natural entrance points. Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths. Islands within an indentation shall be included as if they were part of the water areas of the indentation.
 "4. If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters.
 "5. Where the distance between the low-water marks of the natural entrance points of a bay exceeds twenty-four miles, a straight baseline of twenty-four miles shall be drawn within the bay in such a manner as to enclose the maximum area of water that is possible with a line of that length.
 "6. The foregoing provisions shall not apply to so-called 'historic' bays, or in any case where the straight baseline system provided for in article 4 is applied."

9. The exact boundaries of Block Island Sound are uncertain. The description set forth in the pilotage statute (*see* Appendix at § 46–9.1–2(2)) defines the sound as "the waters of the state" west of a line from Point Judith to the southeasterly point of Block Island, and north of a line drawn from the latter point to Montauk Point, Long Island, New York. The western boundary of the sound is left unstated. Counsel for Rhode Island acknowledged this lack at oral argument, and stated that it was due to the absence of a formal compact between Connecticut and Rhode Island fixing their respective boundaries within Block Island Sound. In the district court plaintiffs introduced through a witness two alternative configurations, denoted Area 1 and Area 2, by which the Rhode Island legislature could have intended to describe Block Island Sound. Area 1 comprised 203.1 square nautical miles, *see United States v. California, supra,* 381 U.S. at 180 n. 4, 85 S.Ct. at 1423, 14 L.Ed.2d at 321. (Black, J., dissenting), and Area 2, 337.9 square nautical miles. Under neither configuration would the sound constitute a "bay" under the semi-circle test. It is unnecessary to give a precise description of either area in light of our ultimate disposition. *See* discussion *infra.*

10. Applying the semi-circle test to the Long Island Sound-Block Island Sound configuration also makes immaterial what the precise western boundary of Block Island Sound actually is. *See* note 9 *supra.*

Plaintiffs contend that the district court erred in applying the semi-circle test to the combination of Long Island Sound and Block Island Sound. They claim that under the Convention a bay must be a "well-marked indentation" and "penetration." Plaintiffs assert that these criteria are not met because the Long Island Sound-Block Island Sound configuration is open at its western end where the East River separates Long Island from the "main land mass", and that when Long Island is removed from the picture there remains only "a mere curvature of the coastline" without the necessary "indentation" or "penetration". However, this claim must fail.

Under plaintiffs' analysis Long Island is to be considered "just another island off the coast" that cannot serve to define, as the district court found it did, the boundary edge of an inland bay. Yet, the Supreme Court has specifically noted that Long Island Sound "is considered inland water rather than open sea." *United States v. Maine,* 420 U.S. 515, 517 n. 1, 95 S.Ct. 1155, 1156, 43 L.Ed.2d 363, 366 (1975). Further, as the district court noted, "plaintiffs' own expert could give no reason why" the semi-circle test should not be applied to the combination of Long Island Sound and Block Island Sound. The court found this to be the most "sensible" configuration upon which to apply the semi-circle test and we cannot say this judgment was improper, particularly since the Convention provides that "[w]here . . . an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths." See Art. 7, § 3, *supra* n. 8. Accordingly, as the district court properly found, Block Island Sound is contained within and is a "bay" within the meaning of 46 U.S.C. § 211.

■ The court also found Block Island Sound to be a bay on an alternative theory, viz. that it was an "historic" bay and there-

fore need not meet the Convention's definitional requirements. *See* Art. 7, § 6, *supra* n. 8. "Historic" bays are those "over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations." *United States v. California, supra* 381 U.S. at 172, 85 S.Ct. at 1419, 14 L.Ed.2d at 317. In holding Block Island Sound an "historic" bay, the district court noted that foreign fishing vessels are not permitted to fish in the sound. The court also credited the testimony of defendants' expert witnesses and the documentary evidence of early maps which indicated that the area directly to the east of Block Island was used as an anchorage and harbor as far back as the 1770's.[11] The court also noted that there are numerous shallow soundings throughout the sound as well as navigational hazards which "belie the assertion that the sound [can] be considered part of the open ocean."

Despite this evidence, however, we here decline to rule whether Block Island Sound is an "historic" bay within the meaning of the Convention and *United States v. California, supra.* In *California,* which involved a dispute between the federal government and the state of California over ownership of offshore seabeds, the United States disclaimed that any of the disputed areas were "historic" inland waters. The Supreme Court avoided holding that such a disclaimer would always be decisive, "for a case might arise in which the historic evidence was clear beyond doubt." 381 U.S. at 175, 85 S.Ct. at 1421, 14 L.Ed.2d at 318. However, the Court held the disclaimer decisive under the circumstances of that case because of what it characterized as "questionable evidence of continuous and exclusive assertions of dominion over the disputed waters . . . ." *Id.* While the United States government is not involved in the present case, and has not issued any disclaimer as to Rhode Island's historic rights in Block Island Sound, nevertheless we consider it significant that although considera-

11. It is unclear whether this early harborage area of Block Island lies east and outside of the boundary line from Point Judith to the southeasterly point of Block Island which R.I. Gen.

Laws § 46–9.1–2(2) (*see* Appendix) specifies as the eastern boundary for Block Island Sound. However, we need not resolve this question in light of our disposition here.

ble historical evidence was presented at trial, "specific acts of dominion were not introduced . . . ," a lack also noted by the district court. Such a record does not appear to us sufficient in light of *United States v. California, supra,* to support a claim that Block Island Sound is an "historic" bay. Moreover, it is unclear just what would be the limits to Block Island Sound under the historic bay theory. This uncertainty is particularly troublesome in view of the fact that the "outer limits of inland waters . . . determine the Country's international coastline." *United States v. California, supra* at 162, 85 S.Ct. at 1414, 14 L.Ed.2d at 311. We therefore refrain from ruling on this question.

■ Plaintiffs also contend that as a matter of constitutional law their Connecticut pilot licenses are valid to traverse the waters of Block Island Sound en route to a Connecticut port.[12] Plaintiffs maintain that as long as a vessel does not enter or depart from a Rhode Island port, that state cannot regulate pilotage of the vessel through its waters. Plaintiffs seek support for this claim in 46 U.S.C. § 215 which exempts coast-wise steam vessels from state regulation. They point to the saving clause of that statute which provides:

" . . . Nothing in [this] title . . . shall be construed to annul or effect any regulation established by the laws of any State, requiring vessels *entering or leaving a port in any such State* . . . to take a pilot duly licensed or authorized by

the laws of such State . . .." (Emphasis supplied).

They assert that this language limits a state's authority to regulate pilotage solely to ships entering and departing its ports. However, this claim cannot avail. Plaintiffs' interpretation is highly implausible in light of 46 U.S.C. § 211, the statute directly at issue in this case, which not only authorizes state pilotage regulations for vessels heading to the "port" of a particular state, but also validates laws concerning "pilots *in the bays, inlets, rivers, harbors, and ports* of the United States . . .." (Emphasis supplied). Moreover, plaintiffs are unable to cite any authority in support of their proposition. *Leech v. Louisiana,* 214 U.S. 175, 29 S.Ct. 552, 53 L.Ed. 956 (1909), to which they point, is inapposite. *Leech* dealt with pilotage in waters forming the boundaries between two states and with 46 U.S.C. § 212 which permits a vessel to use a pilot licensed in either state regardless of which state's port the vessel travels to.[13] *See The Glenearne,* 7 F. 604, 607 (D.Or.1881). Block Island Sound, however, does not serve as a boundary between states. Plaintiffs' reliance on *The Swift Arrow,* 292 F. 651 (D.Mass.1923) is likewise misplaced. In that case a Massachusetts licensed pilot won a judgment for pilotage fees because the vessel refusing his services mistakenly used a Rhode Island pilot to navigate into a Massachusetts port. The case dealt only with the narrow issue "of the obligation to take a Massachusetts pilot for [a] Massachusetts port" where the vessel in question

12. Plaintiffs Losch and Ball make an identical claim with respect to their New York licenses and ports within New York State.

13. In *Leech* a Mississippi-licensed pilot was convicted for piloting a foreign vessel from the Gulf of Mexico up the Mississippi River to New Orleans without a Louisiana license. The Court upheld the conviction on the ground that although the Mississippi River for part of its course formed a boundary between Louisiana and the state of Mississippi, 46 U.S.C. § 212 did not apply because the river lay solely within the state of Louisiana between New Orleans and the Gulf. The Court speculated, though it did not hold, that a Mississippi license might have been good if the vessel's destination were a port within the state of Mississippi. 214 U.S.

at 178, 29 S.Ct. at 553, 53 L.Ed. at 958. Plaintiffs mistakenly contend this establishes that a vessel need only employ a pilot licensed by the state to whose port it is travelling. There is no merit to this claim. The Court's speculation as to the possible validity of a Mississippi license in Louisiana waters was based on the fact that part of the river serves as a boundary between the two states. No such circumstance obtains here. If plaintiffs' interpretation were accepted, a pilot licensed by, *e. g.,* Missouri could pilot a ship from Kansas City all the way to the Gulf despite his unfamiliarity with most of the river's course. Such a result does not appear to be dictated by the Court in *Leech* or by 46 U.S.C. § 212.

was on waters that did not form a boundary between states. *Id.* at 653. It does not stand for the proposition asserted by plaintiffs, viz. that a Massachusetts pilot license was valid for traversing Rhode Island waters because the ship was headed toward a Massachusetts port. Indeed, if we were to accept plaintiffs' interpretation, a vessel heading to one state's port could be navigated by a pilot licensed solely in that state even if the vessel were to travel through coastal waters of numerous other states with which the pilot was completely unfamiliar. Such a holding would deprive states of the right, granted them by 46 U.S.C. § 211, to promote navigational safety and to protect the environmental integrity of their coastlines (from, e. g., oilspills caused by tankers running aground) by regulating pilotage of vessels through their waters.

 Plaintiffs also claim that Rhode Island may not regulate their "piloting activities" because the routes they utilize in piloting vessels through Block Island Sound are more than three miles off the Rhode Island shore. Plaintiffs contend that Rhode Island only has territorial jurisdiction three miles from its seashore by virtue of the Submerged Lands Act of 1953, 67 Stat. 29, 43 U.S.C. § 1301 *et seq.* (1970). We do not, however, find merit in this claim. The issue of a state's territorial limits, *see, e. g., United States v. California, supra* and *United States v. Maine, supra,* is distinct from that of its right to control navigation. States have been permitted to assert their pilotage regulations at distances considerably greater than three miles from their shores. *See, e. g., Wilson v. McNamee,* 102 U.S. (12 Otto) 572, 573–74, 26 L.Ed. 234, 235 (1881) ("about fifty miles from . . . port"); *The Whistler,* 13 F. 295, 296 (D.Or. 1882) ("about 30 miles from the [river] mouth"). By permitting states to regulate local pilotage Congress sought to protect vessels from "invisible hazards" that may be present in a state's waters until the ship can be guided to the open sea.[14] *See Kotch v. Bd. of River Port Pilot Comm'rs,* 330 U.S.

552, 558, 67 S.Ct. 910, 913, 91 L.Ed. 1093, 1097, *rehearing denied,* 331 U.S. 864, 67 S.Ct. 1196, 91 L.Ed. 1869 (1947). And there is no statutory or other basis for imposing a three-mile limit on such regulation.

*Affirmed.*

## APPENDIX

### CHAPTER 9.1–1.—PILOTS—BLOCK IS-LAND SOUND

46–9.1–1. *Legislative declaration.*—The findings and declaration made by § 46–9–1 are hereby made applicable to this chapter.

46–9.1–2. *Definitions.*—For the purposes of this chapter, and as used herein the following terms shall have the following meanings:

. . . . .

(2) "Block Island Sound"—the waters of the state west of a line drawn from the easterly point of Point Judith to the southeasterly point of Block Island and north of a line drawn from the said southeasterly point of Block Island to the easterly point of Montauk Point, Long Island, New York.

. . . . .

(4) "Block Island Sound Pilot License" —a license issued to a person to pilot vessels in Block Island Sound by the state pilotage commission under the provisions of this chapter.

. . . . .

(6) "Register"—every foreign vessel and every American vessel engaged in foreign trade coming into and going out of . . . Block Island Sound waters shall be regulated by the provisions of this chapter and the rules and regulations promulgated thereunder by said commission.

. . . . .

46–9.1–3. *Pilotage commission.*—The Rhode Island state pilotage commission . . . shall have control and jurisdiction

---

**14.** The district court specifically found that "Block Island Sound is not part of the open ocean." We cannot say this finding is clearly erroneous.

over pilotage of vessels entering or departing from any port or landing place of the state or transversing the waters of Block Island Sound.

. . . . .

46–9.1–5. *Vessels required to take pilot.* —Every foreign vessel and every American vessel under register entering or departing from any port or landing place of the state or transversing the waters of Block Island Sound shall take a pilot licensed under this chapter . . .; and such vessels shall be subject to rules and regulations promulgated by the commission. In case of refusal to take such pilot, the master, owner, agent or consignee of any such vessel shall pay the established pilotage fee as if a pilot had been employed.

. . . . .

46–9.1–10. *Use of unlicensed pilots.*—(a) It shall be unlawful for the master, owner, agent or consignee of any vessel, not exempt from the provisions of this chapter, entering or departing from any port or landing place of the state or transversing the waters of Block Island Sound to take on any person not licensed as a Block Island Sound pilot . . . to pilot such a vessel in said waters.

. . . . .

(c) *Violations.*—Violation of the provisions . . . of this section shall be a misdemeanor punishable by a fine not to exceed five hundred dollars ($500); or by imprisonment not to exceed one (1) year, or both.