Michael BALL, C.A. Massey,
D.J. McInerney and T.J.
Knierim, Plaintiffs,

v.

INTEROCEANICA CORPORATION, Turbana Corp., M/V Potomac, her engines, boilers, tackle, etc., in rem, M/V Pocahontas, her engines, boilers, tackle, etc., in rem, and M/V Pocantico, her engines, boilers, tackle, etc., in rem, Defendants.

No. 92 Civ. 1139 (PNL).

United States District Court,
S.D. New York.

Nov. 8, 1994.

Beck & Halberg, New York City for plaintiffs (Herbert B. Halberg, of counsel).

Evans, Osborne and Kreizman, Little Silver, NJ, for defendants (Joel N. Kreizman, of counsel).

## OPINION AND ORDER

LEVAL, Circuit Judge.*

*Findings of Fact and Conclusions of Law*

This is an action for pilotage fees covering the westernmost portion of Long Island Sound (the "Western Sound"), explicitly a segment bounded on the east by a line running southeasterly from the mouth of the Byram River at the New York–Connecticut boundary to Oak Neck Point on Long Island ("Byram River line"), and on the west by Execution Rocks and Sands Point. *See* appendix.[1] In 1991, New York State amended Section 89–b of its Navigation Law. The amendment appears to state that only pilots licensed by New York for these waters are authorized to provide pilotage services there. The action depends on whether the amendment means what it appears to say. For the reasons that follow, in the absence of regulatory interpretation suggesting a different interpretation, I hold that the statute should be interpreted in accordance with its plain meaning.

### Background

The plaintiffs are pilots licensed by the State of New York to navigate foreign vessels and U.S. vessels under registry (*i.e.*, engaged in foreign trade) in Long Island Sound. They are members of an organization known as Sound Pilots, which assigns pilots licensed by the State of New York to pilot such vessels through Long Island Sound.

Plaintiffs offered pilotage services at various times between December 3, 1991 and January 21, 1992, for navigation of defendants' vessels the M/V Pocahontas, the M/V Potomac, and the M/V Pocantico through the Western Sound.[2] They contend that under New York Navigation Law § 89–b, as amended, the services of New York licensed pilots were required for the Western Sound.

The defendant, Turbana Corporation, whose vessels were traversing the Sound to or from Connecticut Sound ports, refused plaintiffs' services, using instead Connecticut licensed pilots for this leg of their journey. Under New York law, refusal of *required* pilotage services, when offered, subjects the vessels and their owners and agents to the payment of pilotage fees. *See* N.Y.Nav. Law § 89–b(1) (McKinney's Supp.1993) ("Whenever the services of such a pilot are refused, the master, owners or consignees shall pay pilotage as if one had been employed."). Because plaintiffs' pilotage services were refused on ten occasions, they seek to recover $8097.30, which is ten times the Long Island Sound statutory pilotage fee of $809.73 per movement.

The defendants contend that the 1991 amendment of New York Navigation Law § 89–b did not alter the previously existing practice, under which either New York or Connecticut pilots piloted vessels between Connecticut ports and Execution Rocks at the westernmost end of the Sound.[3] Defen-

---

* Sitting by designation.

1. The appendix is a rough sketch of the western part of Long Island Sound, showing the line from Oak Neck Point to the New York–Connecticut border at the Byram River, and the line from Execution Rocks to Sands Point at the western end.

2. All three ships are foreign vessels flying the Norwegian flag.

3. According to Bruce B. Fisher, President of Sound Pilots, Inc.

New York State pilotage for Long Island Sound extends to Execution Rocks with a continuation to City Island for the purpose of being safely relieved west of Execution Rocks in the vicinity of City Island where the waters are protected by the lee of the land. At that point the pilotage jurisdiction shifts to the Sandy Hook pilots who pilot the vessel from that location into the Port of New York. On the other hand, going easterly, a Sandy Hook pilot will pilot the vessel from New York Harbor to the City Island—Execution Rocks area where he would be relieved by a Long Island Sound pilot. A Sandy Hook pilot's license

dants argue that because their ships were being piloted to or from Connecticut ports through Long Island Sound by duly licensed Connecticut pilots, they were not required to employ New York licensed pilots in the Western Sound.

The case was submitted to the Court for decision on a written trial record.

### Discussion

Prior to November 27, 1991, Section 89–b(1) of the New York Navigation law provided, in pertinent part:

> Every ... vessel ... transiting the New York state waters of Long Island Sound ... east of Execution Rocks or Sands Point, and any such vessels entering or departing from any port situated on the New York state waters of Long Island Sound east of Execution Rocks or Sands Point, shall take a Long Island–Block Island Sound pilot licensed under the authority of this article or of the laws of any other state having concurrent jurisdiction over these waters.

N.Y.Nav. Law § 89–b(1) (McKinney's 1989) (prior to 1991 amendment).

It is undisputed that, in practice under that statute, vessels employed either a Connecticut or a New York licensed pilot to traverse the Sound, including its western end.

As of November 27, 1991, however, the New York statute was amended to provide (in pertinent part):

> Every ... vessel ... transiting the New York state waters of Long Island Sound ... east of Execution Rocks or Sands Point ... shall take a Long Island–Block Island Sound pilot licensed under the authority of this article. Every foreign vessel and every American vessel under register transiting the New York state waters of Long Island Sound ... east of a line running southeasterly from the mouth of the Byram River at the New York–Connecticut boundary to Oak Neck Point on Long Island shall take a pilot licensed under the authority of this article or of the laws of any other state having concurrent jurisdiction over these waters.

N.Y.Nav.Law § 89–b. (McKinney's Supp. 1993).[4]

This case presents two questions. First, does the amended statute limit pilotage in the Western Sound to pilots licensed by New York, excluding pilots licensed by Connecticut? And (2) if so, does this violate federal law?

*I. Does the 1991 amendment to § 89–b permit pilotage by a Connecticut licensee in the Western Sound?*

■ On its face, the amended statute specifically asserts that the Western Sound waters may be navigated only by pilots "licensed under the authority of this article." The prior statute provided for pilotage

---

ends at Execution Rocks—City Island which is the place where the Long Island Sound pilots license becomes effective.
Aff. at 6.

**4.** Apparently parallel changes were made at the same time to § 89–b(2). Before 1991, it read:
It shall be unlawful for any person not licensed as a Long Island–Block Island Sound pilot under this article *or of the laws of any other state having concurrent jurisdiction* to pilot or to offer to pilot any foreign vessel or any American vessel sailing under register transiting the New York State waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point ... N.Y.Nav.Law § 89–b(2) (McKinney's 1989) (emphasis added).
Subsequent to the 1991 revision, the statute reads:
It shall be unlawful for any person not licensed as a Long Island–Block Island Sound pilot under this article to pilot or to offer to pilot any foreign vessel or any American vessel sailing under register transiting the New York State waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point.... It shall be unlawful for any person not licensed as a Long Island–Block Island Sound pilot under this article *or under the laws of any other state having concurrent jurisdiction* to pilot or to offer to pilot any foreign vessel or any American Vessel sailing under register transiting the New York State waters of Long Island Sound or Block Island Sound *east of a line running southeasterly from the mouth of the Byram River at the New York–Connecticut boundary to Oak Neck Point on Long Island.*
N.Y.Nav.Law § 89–b(2) (McKinney's Supp.1993) (emphasis added).

through these waters by a pilot licensed either by New York or "any other state having concurrent jurisdiction," *i.e.*, Connecticut. The new statute drops that language as to the Western Sound, for which it asserts the requirement of a pilot licensed by New York; it retains the "concurrent jurisdiction" language only with respect to the Sound waters *east* of the New York–Connecticut border at the Byram River line.[5] On its face, the amended statute clearly excludes pilots not licensed by New York from providing pilotage services in the Western Sound. Indeed, the sole functions of the 1991 amendment appear to have been the assertion of territorial jurisdiction over the Western Sound, and the barring of Connecticut pilots therefrom.

"[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Com. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Under this standard, the defendants bear a heavy burden in attempting to persuade the court to interpret the statute otherwise than in accordance with its plain and unambiguous meaning. This burden has not been met.

The defendants make several arguments in support of their contention that the statute, in spite of its express words, authorizes Connecticut pilots to navigate in the Western Sound. They first point to a 1986 opinion by the Attorney General of the State of New York which asserts that even though the Western Sound is New York territorial water, it would violate the Federal Boundary Waters Act to prohibit Connecticut pilots from navigating thereon. *See* Formal Opinion No. 86–F5. As to the relevance of this opinion, the New York Legislature sitting in 1991 is in no way bound by an interpretation of federal law rendered by its state attorney general five years earlier. As the 1991 statu-

tory amendment seems to perform no function other than to exclude Connecticut pilots from the Western Sound, it appears that the New York legislature was either ignorant of, or rejected, this opinion.

The defendants next point to a 1991 memorandum written by the Attorney General to Governor Cuomo purporting to explain the 1991 bill. *See* Memorandum for the Governor re Assembly 950, from Robert Abrams, Attorney General of New York, July 17, 1991. In this memorandum, Attorney General Abrams reiterated his 1986 position that under federal law "New York could not prohibit Connecticut licensed pilots from navigating on the New York waters of Long Island Sound if they were entering or departing a Connecticut port situated on the Sound." *Id.* He opined that the current § 89–b "provides that the waters of Long Island Sound east of Execution Rocks or Sands Point may be transited by a vessel employing either a New York-licensed pilot or a pilot licensed by a state having concurrent jurisdiction," and that the new

> bill would make clear that the portion of Long Island Sound bounded only by New York—west of a line running southeasterly from the Byram River at the New York–Connecticut boundary to Oak Neck Point on Long Island—is subject to regulation exclusively by New York. The law, if amended, would permit the relocation of the present pilot station, which is the transfer point between New York and Connecticut pilots, from a site near Execution Rocks to a place several miles to the east where the waters of the Sound are deeper and more open.

*Id.*

According to Attorney General Abrams, the purpose of the new bill was to shift the transfer point between New York Harbor pilots (Sandy Hook licensees), and Long Island Sound pilots, from Execution Rocks to Byram Point. It is not clear, however,

---

5. Reference to a nautical chart (*see* appendix), shows that the waters *east* of the line extending from the mouth of the Byram River to Oak Neck Point on Long Island, are bounded by Connecticut to the north and New York (Long Island) to the south, and are thus boundary waters shared by New York and Connecticut. *See generally*

*Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133 (2d Cir.1994). To the west of the statutory line, which is roughly perpendicular to the shore, the waters are bounded on both north and south by New York. The statute thus deems this western section New York territorial waters.

whence he derived this interpretation, as it does not appear in the statutory language. His position that Connecticut pilots may navigate to Execution Rocks (and there be relieved by New York Harbor pilots) is difficult to reconcile with his contention that the Long Island Sound pilotage transfer will now take place five miles to the east of Execution Rocks at the state border—the Byram River line. Also, his opinion that pilots licensed by a state with concurrent jurisdiction may pilot ships east of Execution Rocks is directly contrary to the words of the amended statute, which deleted this very provision from the predecessor statute; the new statute makes clear that pilots operating west of the Byram River line [and east of Execution Rocks] must be licensed "under the authority of this article," N.Y.Nav.L § 89–b, and that concurrent jurisdiction exists only to the east of the Byram River Line. Furthermore, the defendants have provided no authority in support of the proposition that statutes should be interpreted in accordance with such a memorandum when it contradicts their terms.

Similar analysis governs the memorandum of Governor Cuomo filed with the amendment. *See* Memorandum of Governor Cuomo filed with Assembly Bill Number 950, November 27, 1991. In this memorandum, Governor Cuomo seconded the analysis of the Attorney General, stating that the bill intended to improve safety of navigation and protect the environment "by establishing a new point at which New York State licensed pilots are required to be aboard a vessel traveling to a New York port." He noted his concern lest the bill "be interpreted to exclude pilots with Connecticut licenses from transiting between the Execution Rocks–Sands Point boundary and the new boundary further east." However, he concluded, based upon the 1986 opinion by the New York Attorney General reaffirmed in 1991, that the bill was not in conflict with federal law "provided that it is interpreted to permit transit on the waters of the Long Island Sound by Connecticut pilots on vessels traveling to and from Connecticut ports situated on the Sound." Governor Cuomo therefore stated that he approved the bill "based on this interpretation of the Attorney General." *Id.*

The memorandum is inconsistent with the words of the statute, and the defendants have provided no authority that such an interpretative gubernatorial memorandum can alter the meaning of a state statute when it directly contradicts the statute's terms.

■ Only slightly greater pause is given by a letter written by S. Fraser Sammis, President of Board of Commissioners of Pilots of the State of New York, to Richard Strauss, Deputy Commissioner of the Department of Transportation of the State of Connecticut, dated October 29, 1991. Interpretive deference is ordinarily given to agencies charged with administering a statutory scheme. *See generally Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Commissioner Sammis stated that:

> The Board is prepared to assure you, and to give its certification that the passage of A–950 into law will not in any way affect pilotage rates for vessels engaged in commerce between the States of Connecticut and New York....
>
> a. The Bill changes, for purely safety reasons, the presently defined pilotage boundary away from Execution Rocks Reef to a point located at the NY/CT border, which is about five miles to the eastward.
>
> b. It is incorrect to imply that the area or zone between the old pilotage boundary (Execution Rocks Reef) and the new one (at the NY/CT) border would create an added pilotage rate zone or surcharge opportunity where vessels "shift", and which could then enable New York licensed pilots to assess a two-thirds surcharge over the base pilotage rate. To repeat, the passage of A–950 will not create any new or extra charges in pilotage fees.

Although such thinking may conceivably underlie his conclusions, Commissioner Sammis did *not* say (as did Governor Cuomo and Attorney General Abrams) that under the amended statute Connecticut pilots may navigate the Western Sound under the authority of their Connecticut licenses.

I note that Connecticut officials apparently understood the bill as meaning what it says. Richard Blumenthal, the Connecticut Attorney General, wrote to John B. Sheffer, II, Chair of New York State Senate Committee on Tourism, Recreation and Sports Development, on May 17, 1991, as the bill was under consideration. He noted that currently, shipping in most of Long Island Sound took place with either a Connecticut or New York licensed pilot, but that the proposed law would "require that all shipping on Long Island Sound west of [Byram] Point obtain a New York licensed pilot." He then pointed out that if the bill passed, he would recommend that Connecticut adopt similar legislation, the result of which would be that many shippers would need to employ two pilots to traverse the Sound.

Governor Lowell Weicker wrote a similar letter to Governor Mario Cuomo of New York. He urged a veto of the bill because it would have an adverse effect both on shipping (by mandating two pilots) and on "the cooperative relationship between New York and Connecticut." *See* letter of Governor Weicker to Governor Cuomo, August 2, 1991.

As defendants have presented no convincing evidence supporting a different interpretation, I read the amended statute, in accordance with its plain meaning, to require a pilot licensed by New York for these waters for navigation through the Western Sound.

In conclusion, I note that there has been some suggestion in the record that the New York administrative agency responsible for interpreting the statute, the Board of Commissioners of Pilots, interprets and implements the statute in accordance with the position of the Governor and the Attorney General—permitting Connecticut pilots to operate between Connecticut Sound ports and the transfer point for pilots operating in New York Harbor. However, no such interpretive material or other evidence was submitted. If in another litigation, such administrative interpretations were submitted, they might justify a different interpretation of the statute.

It is troubling to render what is potentially so important a judgment on so skimpy a record, devoid of administrative interpreta-

tion, especially where the Governor and Attorney General of New York made statements about the meaning of the bill that are inconsistent with its literal terms. Notwithstanding their statements to the contrary, the express terms of this Act threaten to put Connecticut pilots out of business for voyages that traverse the Sound. If the legislative intent was merely to move the transfer point as between New York Harbor pilots and Long Island Sound pilots (whether licensed by Connecticut or New York) from Execution Rocks to the Byram River line, this is not easily found in the words of the statute.

The fact that both the Governor and the Attorney General believed this Act would permit Connecticut pilots to continue to operate in the Western Sound raises the question whether the bill was disingenuously lobbied, and thus raises the further question whether New York's legislators correctly understood the consequences of the bill they passed.

Nonetheless, on the record presented, the court is powerless to do otherwise than to enforce the statutory law as it is written.

*II. Is the amended statute valid under federal law?*

Having concluded that the statute restricts pilotage on the New York territorial waters of Long Island Sound to New York licensees, it remains to be decided whether, as defendants contend, this result contravenes the Federal Boundary Waters Act, 46 U.S.C. § 8501, *et seq.*

This Act, provides, in relevant part:

(a) Except as otherwise provided in this subtitle, pilots in the bays, rivers, harbors, and ports of the United States shall be regulated only in conformity with the laws of the States.

(b) The master of a vessel entering or leaving a port on waters that are a boundary between 2 States, and that is required to have a pilot under this section, may employ a pilot licensed or authorized by the laws of either of the 2 States.

(c) A State may not adopt a regulation or provision that discriminates in the rate of pilotage or half-pilotage between

vessels sailing between the ports of one State and vessels sailing between the ports of different States, or against vessels because of their means of propulsion, or against public vessels of the United States.

. . . . .

(e) Any regulation or provision violating this section is void.

46 U.S.C. § 8501.

Under § 8501(b), a ship entering or leaving a port located on "boundary waters" may be piloted by pilots licensed by either of the two boundary states.[6]

In 1986, the New York Attorney General opined that in light of the purpose of the federal boundary statute, to prevent pilotage wars between adjacent states, "[b]ecause of the proximity of Execution Rocks to the Connecticut border, and its location in relation to the Long Island Sound as a whole, we conclude that a Connecticut pilot may transit the New York waters surrounding Execution Rocks." Formal Opinion No. 86–F5. On the basis of this opinion, the defendants contend that the Boundary Waters Act requires that Connecticut licensed pilots be authorized for vessels traversing Long Island Sound if entering or leaving Connecticut Sound ports. While the New York Attorney General may have been acting in a statesmanlike fashion, seeking to interpret the statute in a neighborly fashion and to diminish the likelihood of a pilotage war, I do not agree with his conclusion that the Boundary Waters Act forbids New York from exerting control in the Western Sound waters.

The Western Sound waters, lying west of the New York–Connecticut border at the mouth of the Byram River, are bordered exclusively by New York State lands. These waters are therefore not a boundary between New York and Connecticut. They are territorial waters of New York, and are subject to regulation by New York under 46 U.S.C. § 8501(a).

Defendants argue that because the *eastern* waters of Long Island Sound are boundary waters, Connecticut pilots cannot be barred from the Sound's *western* section, bordered exclusively by New York State. The rely on § 8501(b), which provides that "The master of a vessel entering or leaving a port on waters that are a boundary between 2 States, and that is required to have a pilot under this section, may employ a pilot licensed or authorized by the laws of either of the 2 States." It is true that *The Clymene,* 9 F. 163 (E.D.Pa.1881), *aff'd,* 12 F. 346 (Cir.Ct.Pa. 1882), lends some support to the defendants' position. In that case, the district court held that a Delaware pilot was entitled to pilot a ship up the Delaware bay and river into the Port of Philadelphia, despite the fact that Philadelphia is situated entirely within Pennsylvania territorial waters and Pennsylvania claimed the right exclusively to regulate pilotage on its territorial waters.

I conclude, however, that this 1881 decision does not represent the state of the law. Subsequent courts have unequivocally rejected its reasoning. In *The Glenearne,* 7 F. 604 (D.Or.1881), decided the same year as *The Clymene,* the court ruled that even though pilots from either Washington or Oregon might lawfully pilot a ship up the Columbia River, once the ship entered the Wallamet River, which was bounded on both sides by Oregon, only an Oregon Pilot could lawfully act.[7] In *Leech v. Louisiana,* 214 U.S. 175, 29 S.Ct. 552, 53 L.Ed. 956 (1909), Justice Holmes followed the reasoning of the *Glenearne,* ruling on facts similar to our own. The Court there held that although part of

---

**6.** In *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133 (2d Cir.1994), the Second Circuit reaffirmed that under § 8501(b), pilots licensed by either state bordering a boundary water may service the ports on both sides. The circuit court held that under § 8501(b), Connecticut pilots could pilot ships into the New York ports that lie on the eastern waters of Long Island Sound which indisputably constitute boundary waters. The court did not discuss the western portion of the Sound at issue in this case.

**7.** In a holding directly relevant to the instant dispute, the court ruled that notwithstanding the Columbia River's status as a boundary, a ship is "bound to take the Oregon pilot over that portion of the voyage or pilotage ground within the limits of the state of Oregon, or pay him half pilotage on account of the offer and refusal" *Id.* at 608.

the Mississippi River constitutes a boundary between Mississippi and Louisiana, as to a section of the river that was exclusively within Louisiana, a Mississippi State license was invalid because concurrent jurisdiction ceases at "the point at which [the waters] cease to be a boundary between two States. Neither continuity of water nor identity of name will carry them beyond that point." *Id.* at 178, 29 S.Ct. at 553.[8] Similarly, in *The Swift Arrow*, 292 F. 651 (D.Mass.1923), the court held that for concurrent jurisdiction to lie over boundary waters, the waters "must be in a real and substantial way a boundary between different jurisdictions . . . they must have, to some extent, at least, the character of a monument on a boundary line." *Id.* at 652.[9] Most recently, in *Warner v. Dunlap*, 532 F.2d 767 (1st Cir.1976), *cert. dismissed*, 470 U.S. 1024, 105 S.Ct. 1387, 84 L.Ed.2d 405 (1985), the First Circuit held that a Massachusetts pilotage license was not valid for traversing Rhode Island waters simply because the ship was heading to a Massachusetts port. *Warner* strongly affirmed the principle that each state has the right to regulate its territorial waters, and may prohibit pilotage on those waters by pilots it has not licensed. *See also Sweatt v. Florida Board of Pilot Commissioners*, 776 F.Supp. 1538 (M.D.Fla 1991), *aff'd*, 985 F.2d 578 (11th Cir.1993) (boundary statute inapplicable to port on waters solely within Florida, even though access to port was through boundary waters of Florida and Georgia).

Because the Western Sound waters are New York territorial waters, as opposed to boundary waters, the provision of § 8501(b), requiring allowance for concurrent pilotage in boundary waters, does not apply. I conclude the amended § 89–b, requiring a New York pilot in the Western Sound, is consonant with the federal act.[10]

### III. Where must pilots board?

 The defendants contend that even if the amended § 89–b requires that ships employ New York pilots to navigate the Western Sound waters, the defendants are not liable for the fees sought by the plaintiffs for voyages from Bridgeport to New York Harbor because the plaintiffs did not offer their services at the point where they were required—the Byram River line. Rather, the pilots attempted to board at dockside in Bridgeport, with the understanding that the vessels would transport them to the Byram River line where they would assume control.[11]

Neither side has presented compelling evidence on this question. In the absence of stronger evidence of industry practice, I reject the defendants' contention. To require pilots to use a lighter, interrupting the ship's voyage, in order to offer their services, when they could easily do so by traveling a short

**8.** The court noted that "If the plaintiff in error had undertaken to pilot from the Gulf to Natchez [Mississippi, through the waters of Louisiana], a different question would have been presented, and it may be that in that case the Mississippi license would have been good." *Id.* Because the case at bar does not involve this scenario, Justice Holmes' dicta does not impact today's decision. Additionally subsequent decisions explain why this dicta does not make sense. *See, e.g., Warner v. Dunlap*, 532 F.2d 767, 771 n. 13 (1st Cir.1976), *cert. dismissed*, 470 U.S. 1024, 105 S.Ct. 1387, 84 L.Ed.2d 405 (1985).

**9.** The court in *The Swift Arrow* also noted that a ship travelling through Rhode Island into Massachusetts "was, of course, at liberty to take a Rhode Island pilot for the intervening waters; but doing so would not relieve her of the obligation to take a Massachusetts pilot for the Massachusetts port, or to pay pilotage fees, if she refused the pilot's offer." *Id.* at 653.

**10.** Because the defendants had suggested in the initial briefing that New York places restrictions on access to pilotage licenses that might bar Connecticut residents from qualifying, I requested additional submissions as to any implications this might raise under the dormant Commerce Clause. In response, the defendants submitted several fragments of trial testimony from the trial of *Interport v. Sammis, supra*. Because these bits of testimony are fragmentary, and because the plaintiffs had no opportunity to cross-examine as to the issues raised in this litigation, I decline to consider them as trial evidence on this issue. Having no evidence before me on the operation of the Long Island Sound licensure procedures of the New York Board of Commissioners of Pilots, I do not reach the issue, and express no opinion on any dormant Commerce Clause implications of § 89–b.

**11.** Bruce Fisher, President of Sound Pilots, testified at deposition that Sound Pilots does not own a pilotage boat for the Byram line and does not intend to purchase one. See Dep. at 36.

distance to the prior port, would involve waste and inefficiency. Absent evidence of any good reasons why the vessel should not carry the pilot a short distance to the turn-over point, or better evidence of industry practice, I decline to adopt such a wasteful and inconvenient standard.

### Damages

■ Plaintiffs seek the full New York statutory Long Island Sound pilotage fee for each refused voyage. It appears, however, that a New York statute, which neither side has cited, calls for a smaller fee. While it is true that the New York regime fixes pilotage rates within the Sound on a per movement basis, based upon the size of the ship, and that defendants' ships would call for a fee of $809.73 per movement of more than 25 miles in the Sound, New York Nav. Law § 89–b(4)(b)(4) (McKinney's Supp.1993) provides that "After entering Long Island Sound or Block Island Sound or departing therefrom, all vessels piloted for less than 25 miles shall pay a transporting charge equal to two-thirds of the statutory rate for registered vessels." Because the Western Sound waters, where plaintiff's services were required, cover a distance of less than 25 miles, it appears under this section that defendants are liable for only two-thirds of the standard New York–Long Island Sound statutory pilotage fee. If the plaintiffs disagree with this calculation, they may submit a brief to the court within one week. The defendants' answering brief shall be due one week thereafter. Barring plaintiffs' submission of such a brief, the court shall find a liability of two-thirds of $809.73 (or $539.82) per movement.

### Conclusion

Plaintiffs are entitled to judgment for each of ten voyages transiting the Western Sound where defendants refused their services. Submit judgment on notice.

SO ORDERED.