McLAUGHLIN, Circuit Judge:
 

 Interoceánica Corporation and Turbana Corporation (together, “Interoceánica”) appeal from a judgment of the United States District Court for the Southern District of New . York (Patterson,
 
 Judge)
 
 dismissing their declaratory judgment action on the ground of res judicata.
 

 BACKGROUND
 

 This appeal concerns pilotage (the navigation of ships) in Long Island Sound. Two landmarks are important to the pilots: (1) the “Byram River Line,” an imaginary line running from the mouth of the Byram River in Connecticut across Long Island Sound to Oak Neck Point on the southern shore of the Sound; and (2) “Execution Rocks,” in Long Island Sound several miles west of the By-ram River Line, just off Sands Point on the Sound’s southern shore.
 
 See Ball v. Interoceanica Corp.,
 
 867 F.Supp. 226, . 235 (S.D.N.Y.1994) (map),
 
 aff'd,
 
 71 F.3d 73 (2d Cir.1995),
 
 cert. denied,
 
 — U.S. —, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996). The waters
 
 east
 
 of the Byram River Line are bordered on the. north by Connecticut and on the south by New York (Long Island), and are therefore state “boundary waters” subject to the concurrent jurisdiction of the two states.
 
 See Ball v. Interoceanica Corp.,
 
 71 F.3d 73, 75 (2d Cir.1995),
 
 cert. denied,
 
 — U.S. —, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996). In contrast, the waters
 
 west
 
 of the Byram River Line are bordered by New York on both sides, and for that reason are “territorial waters” of New York state, subject to New York’s exclusive jurisdiction.
 
 See id.
 
 Execution Rocks lie in New York’s territorial waters.
 

 Both New York and Connecticut license pilots to navigate ships in Long Island Sound. Until 1991, New York Navigation Law § 89-b(2) read:
 

 It shall be unlawful for any person not licensed as a Long Island-Block Island Sound pilot under this article or of the laws of any other state having concurrent jurisdiction to pilot or to offer to pilot any foreign vessel or any American vessel sailing under register transiting the New York state waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point ... unless such vessel shall have on board a Long Island-Block Island Sound pilot licensed under this article or under the laws of any other state having concurrent jurisdiction.
 

 Thus, § 89-b(2) expressly sanctioned licenses issued under the laws of a sister state; and New York-licensed and Connecticut-licensed “Long Island Sound pilots” customarily navigated ships between the Byram River Line and Execution Rocks off Sands Point, Long Island.
 

 In 1991, however, New York amended § 89-b(2) to read:
 

 It shall be unlawful for any person not licensed as a Long Island-Block Island Sound pilot under this article to pilot or to offer to pilot any foreign vessel or any American vessel sailing under register transiting the New York state waters of Long Island Sound or Block Island Sound east of Execution Rocks or Sands Point ... unless such vessel shall have on board a Long Island-Block Island Sound pilot licensed under this article. It shall be
 
 *-1487
 
 unlawful for any person not licensed as a Long Island-Block Island Sound pilot under this article or under the laws of any other state having concurrent jurisdiction to phot or to offer to pilot any foreign vessel or any American vessel sailing under register transiting the New York state waters of Long Island Sound and Block Island Sound east of a line running southeasterly from the mouth of the Byram River at the New York-Connecticut boundary to Oak Neck Point on Long Island.
 

 The effect of the 1991 amendment is to bar phots from navigating ships between the By-ram River Line and Execution Rocks unless they have a New York license. Whereas before 1991 a Connecticut-licensed pilot could navigate a ship into Long Island Sound all the way to Execution Rocks, where he would turn the vessel over to a New York-licensed “Sandy Hook pilot” for the trip into New York Harbor, now such a phot may navigate a ship into Long Island Sound only up to the Byram River Line. At that point, he must turn the ship over to a New York-licensed Long Island Sound pilot for the trip further west to Execution Rocks and then, as has always been the practice, to a Sandy Hook phot for the trip into New York Harbor. (This third and final leg of the trip is not in issue.)
 

 Interoceánica has long sailed ships between ports in Connecticut and New York Harbor. After the amendment to § 89-b(2), a group of New York-licensed Long Island Sound pilots offered their services to navigate Interoceanica’s ships between the By-ram River Line and Execution Rocks. In-teroceánica refused the phots’ services and insisted upon using its own Connecticut-licensed pilots for this leg of the journey.
 

 The spurned New York pilots sued Intero-ceánica in the United States District Court for the Southern District of New York (Pierre N. Leval, Judge) pursuant to § 89-b(l), which provides that refusal of required pilotage services, when offered, subjects the vessels and their owners to payment of pilot-age fees anyway. Interoceánica answered that: (1) the amended § 89-b still allowed Connecticut-licensed pilots to navigate between the Byram River Line and Execution Rocks; and (2) if it did not, then the' statute violated the Federal Boundary Waters Act, 46 U.S.C. § 8501(b). The parties consented to a decision by the court on a written trial record. Rejecting both of Interoceanica’s arguments, the court determined that the plain language of § 89-b restricted pilotage between the Byram River Line and Execution Rocks to New York-licensed pilots and that § 89-b did not violate the Federal Boundary Waters Act.
 
 See Ball,
 
 867 F.Supp. at 228-33.
 

 Sometime in the middle of the
 
 Ball
 
 proceedings, Interoceánica hatched a new argument: that the New York licensing regulations, as enforced by New York officials, had the practical effect of excluding Connecticut residents from getting New York licenses, and that this discrimination (in conjunction with the revised § 89-b(2)) violated the Commerce Clause of the United States Constitution.
 
 See
 
 U.S.Const. art. 1, § 8, el. 3;
 
 see generally CTS Corp. v. Dynamics Corp. of America,
 
 481 U.S. 69, 87, 107 S.Ct. 1637, 1648-49, 95 L.Ed.2d 67 (1987). The district court allowed that Interoceánica might be right, but found the evidence on that issue insufficient to render a decision on the merits.
 
 See Ball,
 
 867 F.Supp. at 233 n. 10.
 

 Interoceánica appealed Judge Leval’s decision. In the meantime, it also sued Sound Pilots, Inc. (“Sound Pilots”) — an association of New York-licensed Long Island Sound pilots, of which the plaintiffs in the
 
 Ball
 
 case are members — in the United States District Court for the Southern District of New York (Robert P. Patterson Jr.,
 
 Judge),
 
 pursuant to 28 U.S.C. § 2201. Interoceánica sought a declaration that: (1) it has, at least temporarily, conformed with § 89-b’s requirements by agreeing to use a New York-licensed pilot between the Byram River Line and Execution Rocks, but it is not required to provide transportation for a New York-licensed pilot to or from the endpoints of his service; and (2) the amended § 89-b violates the Commerce Clause.
 

 Sound Pilots moved for summary judgment on the ground that Interoceanica’s claims were barred by the doctrine of res judicata. Judge Patterson agreed that Inter-
 
 *-1486
 
 oceaniea’s first claim — the compliance and transit claim — was barred. The court found, however, that its Commerce Clause claim was not barred by res judicata.
 
 See Intero-ceanica Corp. v. Sound Pilots, Inc.,
 
 No. 95 CIV 0950, 1995 WL 412432 at *1 (S.D.N.Y. July 12, 1995) (unpublished order). The court also stayed any further action in the case until we decided the appeal from Judge Leval’s decision in
 
 Ball,
 
 which was pending at that time.
 

 After we affirmed the district court in
 
 Ball, see Ball v. Interoceanica Corp.,
 
 71 F.3d 73 (2d Cir.1995) (per curiam), Sound Pilots renewed their motion for summary judgment in the present case. Reversing itself, the district court now granted summary judgment to Sound Pilots on Interoceanica’s Commerce Clause claim, stating:
 

 [Interoceánica] contests] the motion on the ground that res judicata does not apply because
 
 Ball
 
 was a suit to recover pilotage fees for ten distinct voyages, whereas this suit seeks declaratory judgment and involves different voyages. Notwithstanding [Interoceanica’s] contentions,
 
 Ball
 
 involved the same parties or their privies and the same claims as the litigation currently before this Court and thus bars this litigation. Despite the fact that the
 
 Ball
 
 court did not rule on the particular issues which form the basis for [Interoceanica’s] current complaint, they could have been presented to that court, and at least in part were, although the court declined to rule on them. For this reason, the doctrine of res judicata bars [Interoceánica] from litigating those issues before this Court.
 

 Interoceanica Corp. v. Sound Pilots, Inc.,
 
 No. 95 CIV 0950, 1996 WL 337279 at *3 (S.D.N.Y. June 19, 1996) (unpublished Opinion and Order) (citations omitted).
 

 Interoceánica now appeals, arguing that the district court erred in its application of res judicata principles to Interoceanica’s Commerce Clause claim.
 

 DISCUSSION
 

 Interoceánica contends that the district court should not have applied res judicata to bar its Commerce Clause argument. It maintains that its latest declaratory judgment action does not arise from the same “factual grouping” or “transaction” as the original
 
 Ball
 
 litigation because Interoceánica now seeks a declaration of rights only as to voyages
 
 subsequent
 
 to those litigated in
 
 Ball.
 
 We agree.
 

 Res judicata operates as “claim preclusion.” Generally, a judgment in an action “precludes the parties ... from relitigating issues that were or could have been raised in that action.”
 
 Federated Dep’t Stores, Inc. v. Moitie,
 
 452 U.S. 394, 898, 101 S.Ct. 2424, 2427-28, 69 L.Ed.2d 103 (1981). More specifically:
 

 “the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, [i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.”
 

 Securities and Exch. Comm’n v. First Jersey Secs., Inc.,
 
 101 F.3d 1450, 1463 (2d Cir.1996) (quoting
 
 Nevada v. United States,
 
 463 U.S. 110, 129-30, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983) (internal quotations omitted)).
 

 It must first be determined that the second suit involves the same “claim” — or “nucleus of operative fact” — as the first suit.
 
 Apparel Art Int'l Inc. v. Amertex Enters. Ltd.,
 
 48 F.3d 576, 583 (1st Cir.1995). ‘Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, [and] whether the same evidence is needed to support both claims.”
 
 National Labor Relations Bd. v. United Techs. Corp.,
 
 706 F.2d 1254, 1260 (2d Cir.1983);
 
 see also Saud v. Bank of New York,
 
 929 F.2d 916, 919 (2d Cir.1991). To ascertain whether two actions spring from the same “transaction” or “claim,” we look to whether the underlying facts are “related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties’ expectations or business understanding or usage.” Restatement (Second) of
 
 *-1485
 
 Judgments § 24(b);
 
 see also Apparel Art Int'l,
 
 48 F.3d at 584.
 

 We recently discussed these principles as applied to lawsuits that involve parallel but distinct transactions:
 

 With respect to the determination of whether a second suit is barred by res judicata, the fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.
 

 If the second litigation involved different transactions, and especially subsequent transactions, there generally is no claim preclusion. For example, when a contract was to be performed over a period of time and one party has sued for a breach but has not repudiated the contract, res judica-ta will preclude the party’s subsequent suit for any claim of breach that had occurred prior to the first breach-of-contract suit, but will not preclude a subsequent suit for a breach that had not occurred when the first suit was brought.
 

 First Jersey Sec.,
 
 101 F.3d at 1463-64 (internal quotations and citations omitted).
 

 The
 
 Ball
 
 action was brought by several pilots to recover their pilotage fees for discrete offers of services to Interoceánica “on ten occasions.”
 
 Ball,
 
 867 F.Supp. at 227. The judgment in that case covered only the “ten voyages ... where [Interoceánica] refused [the pilots’] services.”
 
 Id.
 
 at 234. After those ten trips, New York-licensed Long Island Sound pilots continued to offer their services to Interoceánica, and Interoceánica occasionally accepted their services, but only under continued protest of the general pilot-age scheme imposed by § 89-b. Sound Pilots notified Interoceánica that, if it again sailed without the services of a New York-licensed pilot, the pilots would again resort to legal action. That threat spurred Intero-ceánica to bring this declaratory judgment action to resolve its rights in any and all trips
 
 after
 
 the original ten that were the subject of the
 
 Ball
 
 suit.
 

 The notion of a “transaction” is prismatic in the sense that it takes .coloration from its surroundings. It must be given a flexible, common-sense construction that recognizes the reality of the situation.
 
 See
 
 Restatement (Second) of Judgments § 24(2) (“[w]hat factual grouping constitutes a ‘transaction’ [is] to be determined pragmatically”). Because this case concerns distinct voyages after those litigated in
 
 Ball,
 
 it does not arise out of the same “transaction or connected series of transactions” as the
 
 Ball
 
 proceeding.
 
 See United Techs.,
 
 706 F.2d at 1260. True, the facts in the two proceedings are similar. Yet they give rise to separate statutory wrongs— just as a party who breaches a contract twice in the same way has committed two separate breaches.
 
 See Prime Management Co. v. Steinegger,
 
 904 F.2d 811, 816 (2d Cir.1990). While the subsequent voyages represent wrongs that are the “same” in legal theory, they are not related in time, space, or origin to the wrongs litigated in
 
 Ball.
 
 Res judicata, therefore, does not apply to bar Interoceanica’s Commerce Clause claim in this case.
 

 Sound Pilots argues that, even if res judi-cata does not apply, Interoceánica is collaterally estopped from raising a Commerce Clause defense. We disagree.
 

 Collateral estoppel operates as “issue preclusion.” A party is collaterally estopped from raising an issue in a proceeding if: (1) the identical issue was raised in a previous proceeding; (2) the issue was “actually litigated and decided” in the previous proceeding; (3) the party had a “full and fair opportunity” to litigate the issue; and (4) the resolution of the issue was “necessary to support a valid and final judgment on the merits.”
 
 Central Hudson Gas & Elec. v. Empresa Naviera Santa
 
 S.A., 56 F.3d 359, 368 (2d Cir.1995);
 
 See also Davis v. Halpern,
 
 813 F.2d 37, 39 (2d Cir.1987).
 

 The district court in the
 
 Ball
 
 action did not decide Interoceanica’s Commerce Clause defense on the merits. Indeed, it
 
 *-1484
 
 “[did] not reach the issue,” and “express[ed] no opinion on any [ ] Commerce Clause implications of § 89-b.”
 
 Ball,
 
 867 F.Supp. at 233 n. 10. Interoceanica’s Commerce Clause defense was, therefore, not “actually litigated and decided” in the previous proceeding and certainly was not “necessary to support a valid and final judgment on the merits.” As such, Interoceaniea’s Commerce Clause claim is not now barred by collateral estoppel.
 

 CONCLUSION
 

 Because the district court erroneously applied res judicata to bar Interoceaniea’s Commerce Clause claim, and because collateral estoppel does not bar that claim, the district court’s grant of summary judgment against Interoceánica is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.