Joseph WALDMAN, Plaintiff,

v.

VILLAGE OF KIRYAS JOEL and Abraham Weider, Jacob Mattelman, Solomon Wertzberger, Yudel Kahan, Mendel Schwimmer, Mayer Hirsch and Gedalye Szegedin, in their official and individual capacities, Kiryas Joel Housing Authority, Moses Neuman, in his official and individual capacity, Vaad Hakirya of Kiryas Joel, Inc., and Town of Monroe, Orange County Board of Elections, Defendants.

No. 97 Civ. 7506 (BDP).

United States District Court,
S.D. New York.

March 12, 1999.

Michael H. Sussman, Stephen Bergstein, Helen G. Ullrich, Law Offices of Michael H. Sussman, Goshen, NY, for plaintiff.

William P. Harrington, Bleakley Platt & Schmidt, White Plains, NY, for defendants Kiryas Joel Housing Authority and Moses Neuman.

Frederick P. Hafetz, Susan R. Necheles, Gwen M. Schoenfeld, Goldman & Hafetz, New York City, for defendants Meyer Hirsch and Vaad Hakiryah of Kiryas Joel, Inc.

Gerald A. Novack, Kirkpatrick & Lockhart LLP, New York City, Andrew S. Fisher, Fisher, Fisher & Berger, New York City, for defendants Village of Kiryas Joel and Gedalye Szegedin.

Dennis E.A. Lynch, Dorfman, Lynch & Knoebel, Nyack, NY, for defendants Abraham Weider, Jacob Mittleman, Solomon Wertzberger, Yudel Kahan and Mendel Schwimmer.

## OPINION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

Plaintiff Joseph Waldman has asserted claims pursuant to 42 U.S.C. § 1983 against the Village of Kiryas Joel, its officials in their individual and official capacities, Vaad Hakiryah of Kiryas Joel, an association of the members of the Congregation Yetev Lev, and a former trustee and leader of the Vaad Hakiryah, Meyer Hirsch. He also asserts claims against the Town of Monroe, the Orange County Board of Elections, and the Village of Kiryas Joel Housing Authority and its director, Moses Neuman ("*Waldman II* ").

Waldman's first claim asserts, in essence, that the existence and operation of the Village as a theocracy violates the Establishment Clause of the First Amendment to the United States Constitution as well as the New York State Constitution. His second claim, which is not involved in this motion, asserts that the defendants have infringed his right to vote in violation of the Fourteenth Amendment to the United States Constitution and the New York Constitution. As relief, Waldman seeks, the dissolution of the Village and damages. The Village, its officials, the Housing Authority and Moses Neuman, and Vaad Hakiryah and Meyer Hirsch move pursuant to Fed.R.Civ.P.Rule 12(c) to dismiss Waldman's first claim based on *res judicata* and a lack of standing. For the reasons stated below, the motion is granted.

## BACKGROUND

In deciding this motion brought under Fed.R.Civ.P.Rule 12(c), the same standards applicable to a motion under Rule 12(b)(6) apply. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994). Thus, the Court must accept the allegations in Waldman's complaint and construe them in his favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). A defense

of res judicata may be tested by a motion pursuant to Rule 12(c). *See Yaba v. Roosevelt,* 961 F.Supp. 611, 615 n. 2 (S.D.N.Y.1997). The Court may take notice of the submissions in prior actions that form the basis for the defense of *res judicata. See Day v. Moscow,* 955 F.2d 807, 811 (2d Cir.1992) (when all relevant facts are shown by the court's own records, of which the court may take notice, *res judicata* may be tested on a Rule 12 motion); *see also Shuttlesworth v. Birmingham,* 394 U.S. 147, 157, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (taking judicial notice of related case between same parties).

The following facts have been construed with these principles in mind. The Village of Kiryas Joel, in Orange County, New York is a religious enclave of Satmar Hasidim who are practitioners of a strict form of Judaism. The residents of Kiryas Joel are extremely religious people who make few concessions to the modern world and go to great lengths to avoid assimilation into it. They interpret the Torah strictly, segregate the sexes outside the home, speak Yiddish as their primary language, eschew television, radio and English language publications, and dress in distinctive ways. *See Bd. of Educ. of Kiryas Joel v. Grumet et al.,* 512 U.S. 687, 690–691, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

Plaintiff Joseph Waldman is a resident of the Village and a member of the Committee for the Well–Being of Kiryas Joel, a voluntary association concerned with the affairs of the Village. Waldman was a member of the main synagogue in the Village, Congregation Yetev Lev ("Congregation"), until he was expelled by the Congregation in 1989, and labeled a dissident. This action, as well as related litigation, discussed below, arise from what Waldman claims to be an on-going campaign of intimidation and religious-based harassment imposed on the Village and its dissidents by the theocracy that controls the Congregation and dominates life in the Village. Waldman's various complaints have challenged what he claims to be the pervasive and unconstitutional entwinement between secular and religious affairs in Kiryas Joel.

In October 1997, following earlier proceedings in this case, this Court granted Waldman a preliminary injunction requiring the movement of the polling place in the Village from the Congregation's synagogue to a neutral site after Waldman demonstrated that voting arrangements impermissibly burdened the right of Waldman and his fellow dissidents to vote in local elections. *See Waldman v. Village of Kiryas Joel et al.,* 97 Civ 7506 (S.D.N.Y. Oct. 27, 1997).

The complaint in this action—*Waldman II* —alleges that in May 1989, Grand Rabbi Teitelbaum, Abraham Wieder, who at that point was the deputy mayor of the Village, and Meyer Hirsch met with building contractors doing business in the Village. The Grand Rabbi allegedly told the contractors that in order to secure building permits from the Village, contractors had to donate $10,000 to the Congregation for each housing unit to be built. Village officials required residents to make donations to the Congregation to obtain Village approval for any improvements or additions to their property. Further, Village officials also required donations to the Congregation from dissidents when their contractors applied for building permits. At the same May 1989 meeting, the Grand Rabbi also allegedly ordered that no one would be permitted to reside in the Village without the prior written permission of the Congregation. Further, Abraham Weider, has allegedly announced that the Village will not enforce the laws of the State of New York when they conflict with Jewish law.

Since 1989, Village officials allegedly have denied dissidents apartments in both public and private housing. On or about July 1996, the Director of the Kiryas Joel Housing Authority, Moses Neuman, allegedly told Alter Goldberger that because he had been expelled from the Congregation, he would never obtain housing in the Village. Goldberger nonetheless applied for

an apartment in a public housing apartment, and learned in January 1997, that he had been eliminated from the lottery for public housing. In October 1996, Neuman allegedly refused to give a housing application to Natan Hecht, again, because of his association with religious dissidents.

In June 1997, members of the Committee for the Well-being of Kiryas Joel allegedly notified the Village Board of its intention to hold a peaceful demonstration in Sanz Court where the Rabbi lives. Sanz Court is a public street in the Village. In response, the Village Board passed an ordinance prohibiting anyone who did not live on Sanz Court from walking on that street. These allegations form the basis of *Waldman II*.

*Waldman II* follows on the heels of prior litigation arising from religious and political differences within the Village. In 1995, Waldman's brother Zalman Waldman along with Meyer Deutsch, A.H. Weinstock and Khal Charidim Kiryas Joel, a religious corporation which operates as a congregation, brought suit in the Southern District of New York, against the Village, the mayor of the Village, Leopold Lefkowitz and the deputy mayor of the Village, Abraham Weider. Joseph Waldman was the party representative of *Khal Charidim. See Khal Charidim Kiryas Joel, Zalman Waldman, Meyer Deutsch & A.H. Weinstock v. Village of Kiryas Joel, Leopold Lefkowitz, Mayor, and Abraham Weider, Deputy Mayor, Village of Kiryas Joel,* 95 Civ. 8378 (Rakoff, J.) (*"Khal Charidim"*).

In *Khal Charidim*, the plaintiffs alleged that the defendants wrongly deprived them of a place to assemble and to pray. Allegedly, when the plaintiffs announced their intention to use a building on 3 Van Buren Drive for religious services, the defendants cited the owners of the building for numerous violations of building, zoning and sewer laws and imposed heavy fines on them.

The plaintiffs in *Khal Charidim* also claimed they had been deprived of equal protection and that the defendants had violated their rights to the free exercise of religion and to freedom of assembly. For relief, the plaintiffs requested the Court to strike, as unconstitutional, the provision in the Village's zoning ordinance that required any building functioning as a synagogue to be located on a minimum of two acres, compensatory and punitive damages and attorneys' fees.

In early 1997, Joseph Waldman, along with the Committee for the Well-being for Kiryas Joel, Nathan Hecht and Atler Goldberger sued the Village of Kiryas Joel, and Moses Neuman as the Housing Director of Kiryas Joel in this Court. *See Waldman, et al. v. Village of Kiryas Joel, Housing Director of the Village of Kiryas Joel, Henry Cisneros, Secretary of the United States Department of Housing and Urban Development, and Joseph B. Lynch, Commissioner of the New York State Division of Housing and Community Renewal,* 97 Civ. 74 (S.D.N.Y. Jones, J.) (*"Waldman I"*).

In *Waldman I*, the plaintiffs described the Village's residents as deeply religious individuals and contended that the plaintiffs' open pursuit of their religious beliefs had resulted in their expulsion from the Congregation and in the expulsion of their children from the Congregation's religious school. The plaintiffs alleged that the Village had a policy of requiring religious approval prior to the sale or rental of dwelling units and that a $10,000 contribution to the Congregation was required to build or sell housing units in the Village. The plaintiffs also alleged that Neuman told Hecht and Goldberger that neither they, nor any other dissident, would be allowed to enter the Village's housing projects or secure an apartment in them.

*Waldman I* alleged that the conduct described constituted an ongoing governmental policy to advance religion and amounted to an excessive entanglement of the government with religion. Specifically, the complaint in *Waldman I* alleged:

By virtue of the conduct herein alleged, the defendants deprived, and are continuing to deprive, plaintiff Waldman, individually, and plaintiff Committee, collectively, of the rights, privileges and immunities secured by the Constitution of the United States, specifically: the right of plaintiffs under the First Amendment, as taxpayers, to be free from government funded religious practice, from governmental advancement of religion, and from governmental entanglement with religion.

For relief, the plaintiffs sought an order declaring that the defendants' conduct violated the Establishment and Free Exercise Clauses, the Equal Protection Clause, and the Fair Housing Act. The plaintiffs also sought a preliminary and permanent injunction barring the United States and New York State from delegating to the Village discretionary authority in the distribution of government subsidized dwelling units.

*Khal Charidim* went to trial before Judge Jed Rakoff in March 1997. Plaintiff's pre-trial brief stated:

plaintiffs allege and shall prove that theocratic considerations underlie their mistreatment; they will show that the 'majority' has established a state religion in Kiryas Joel, one impermissibly permeating all forms of secular and political life and that the oppression experienced by plaintiffs and those associated with them derives from their refusal to accept the dictates—in the secular sphere—imposed by this religious majority. Allowing such a regime to dominate political life is tantamount to allowing the domination by one religious sect of the political life of the community, the establishment of a state religion. Such an actuality violates the First Amendment's ban on establishment as it inhibits the insular minority's right to freely exercise its own religious freedom.

According to the defendants in *Waldman II*, these allegations are the prelude to *res judicata* since they reflect the close similarity of the issues litigated in *Khal Charidim* and those asserted in *Waldman II*. Waldman, on the other hand, maintains that this language, in a pre-trial brief, did not purport to amend the complaint or to assert religious fusion issues as claims. He also maintains that any trial evidence in *Khal Charidim* addressing the fusion of religious and secular authority was meant as background to discrimination claims and does not mean that the fusion issues were litigated.

In the parties' joint pre-trial order in *Khal Charidim*, however, the plaintiffs listed, as issues of ultimate fact to be tried, their contentions that: (1) there is a strong interlocking leadership in the Village of Kiryas Joel between secular and religious institutions, (2) the Village of Kiryas Joel government is an extension of the Congregation Yetev Lev and the rule of Grand Rabbi Moses Teitelbaum and his appointee, Rabbi Aron Teitelbaum, and (3) the Village government is not independent of religious control, but acts to maintain the religious hegemony of the dominant congregation.

On the fifth day of trial in *Khal Charidim* the parties agreed to a settlement. The Village agreed: (1) not to discriminate against any person with regard to any service or benefit offered by the Village, (2) to issue a permit for the facility on 3 Van Buren road, (3) to establish with the plaintiffs a community relations board that would resolve any grievances with respect to the distribution of services, (4) that members of the Village school board would serve on no more than one board within the Village, and (5) to pay $300,000 to Khal Charidim. The Court retained jurisdiction to enforce the settlement. Finally, as part of the settlement, the parties agreed to the dismissal, with prejudice, not only of *Khal Charidim*, but also *Waldman I*. The stipulation of discontinuance of *Waldman I* was filed on April 15, 1997.

Subsequent to the settlement agreement, the plaintiffs brought a motion for

contempt, alleging that the defendants had failed to abide by certain provisions of the settlement agreement, and the defendants cross-moved alleging certain various misconduct by the plaintiffs. The defendants also claimed that the Housing Authority was not an agency of the Village and that it had never been named or served in *Khal Charidim* or *Waldman I.*

Judge Rakoff, in a Memorandum and Order dated September 4, 1997, concluded that the Housing Authority was not bound by the settlement agreement since it was neither a party to *Khal Charidim* nor to the agreement. He found that, while as part of the bargained-for settlement, the plaintiffs agreed to dismiss, with prejudice, another action then pending against the Village, the Housing Authority was not a defendant in that action (*Waldman I*). On October 9, 1997, Waldman filed the complaint now before this Court (*Waldman II*).

*Waldman I* and *Waldman II* have the following issues in common:

(1) Expulsion of dissidents (*Waldman II* Complaint, I, ¶ 24, 25; *Waldman I* Complaint, ¶ 19);

(2) Expulsion of dissidents' children from parochial schools (*Waldman II* Complaint, ¶ 48; *Waldman I* Complaint, ¶ 20);

(3) Denial of public housing to dissidents Hecht and Goldberger (*Waldman II* Complaint, ¶¶ 72–78; *Waldman I* Complaint, ¶¶ 26–27);

(4) Prior approval by the Congregation of new residents (*Waldman II* Complaint, ¶¶ 68, 73; *Waldman I* Complaint, ¶¶ 53–60);

(5) Requirement of a contribution to the Congregation for a building permit (*Waldman II* Complaint, ¶¶ 59–67; *Waldman I* Complaint ¶¶ 56, 61);

(6) Village incorporated solely for the benefit of Satmar Hasidic (*Waldman II*) Complaint, ¶¶ 15–20, Waldman I Complaint, ¶¶ 11–13; and

(7) Overlap between Village leadership and membership to Congregation (*Waldman II* Complaint, ¶ 21–22, 45; *Waldman I* Complaint, ¶ 19).

*Khal Charidim* and *Waldman II* have the following issues in common:

(1) Expulsion of dissidents (*Waldman II* Complaint, ¶¶ 24, 25; *Khal Charidim* Complaint, ¶¶ 28–29);

(2) Expulsion of dissidents' children from parochial schools (*Waldman II* Complaint, ¶ 48; *Khal Charidim* Trial Transcript, pages 134–137);

(3) Interference with Waldman's candidacy for school board (*Waldman II* Complaint, ¶¶ 45–53; *Khal Charidim* Trial Transcript, pages 134–137);

(4) Termination of dissident Hecht from Village employment (*Waldman II* Complaint, ¶ 26; *Khal Charidim* Trial Transcript, page 715);

(5) Location of polling place in the Congregation (*Waldman II* Complaint, ¶¶ 29, 38; *Khal Charidim* Trial Transcript, pages 137–138);

(6) Prior approval by the Congregation of new residents (*Waldman II* Complaint, ¶¶ 68, 73; *Khal Charidim* Complaint, ¶ 29(d));

(7) Creation of special school district (*Waldman II* Complaint, ¶ 23; *Khal Charidim* Trial Transcript, pages 115–117);

(8) Requirement of contribution to the Congregation for a building permit (*Waldman II* Complaint, ¶¶ 59–67; *Khal Charidim* Brief in Opposition to Summary Judgment, pages 6–8);

(9) Non-enforcement of New York law that conflicts with Village officials' adherence to Jewish law (*Waldman II* Complaint, ¶¶ 69–70; *Khal Charidim* Trial Transcript, pages 568–572); and

(10) Overlap between Village leadership and membership of Congregation (*Waldman II* Complaint, ¶¶ 21–22, 45; *Khal*

*Charidim* Joint Pre–Trial Order, page 12, ¶ 1).

New facts alleged in *Waldman II* are:

(1) The members of the Committee for the Well–Being of Kiryas Joel's attempt to have a demonstration at Sanz Court;

(2) The interference with Waldman's 1997 candidacy for public office; and

(3) The location of the polling place for the 1997 election.

The principle issue on this motion is whether these similarities in the matters raised and Waldman's participation in the prior suits give rise to *res judicata.*

## DISCUSSION

*1. Res Judicata*

 " 'The doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, [i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.' " *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997) (citation omitted). Thus, *res judicata* "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided." *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (quoting *Clarke v. Frank,* 960 F.2d 1146, 1150 (2d Cir.1992)). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Id.* (citing *NLRB v. United Technologies,* 706 F.2d 1254, 1260 (2d Cir. 1983)).

 The case law requires that the concept of "transaction" receive "a flexible, common-sense construction" that recognizes the practical realities presented. *Interoceanica,* 107 F.3d at 90 (citing Restatement (Second) of Judgments § 24(2)). Of primary importance is the identity of facts surrounding the occurrence which constitutes the cause of action, as opposed to the legal theory within which a complaint is framed. *Woods,* 972 F.2d at 39 (citing *Berlitz Schools of Languages of America, Inc. v. Everest House,* 619 F.2d 211, 215 (2d Cir.1980) ("[W]hatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of *res judicata.*")). In sum, new legal theories do not amount to a new cause of action as to defeat *res judicata. In re Teltronics Services, Inc.,* 762 F.2d 185, 193 (2d Cir.1985). Further, a stipulation of dismissal with prejudice is considered a final judgment on the merits for purposes of *res judicata, Chase Manhattan, N.A. v. Celotex Corp.,* 56 F.3d 343, 345 (2d Cir.1995), as is a settlement agreement, unless the parties provide otherwise. *Greenberg v. Bd. of Governors of Federal Reserve System,* 968 F.2d 164, 169 (2d Cir.1992); *see also Cahill v. Arthur Andersen & Co.,* 659 F.Supp. 1115, 1120 (S.D.N.Y.1986).

 The pleading of additional incidents in a second complaint will not necessarily bar the application of *res judicata. See Yaba v. Roosevelt,* 961 F.Supp. 611, 622 (S.D.N.Y.1997) (plaintiff's additional incidences of harassment were insufficient to defeat *res judicata* because allegation of a hostile work environment, by its nature, included any claims of an on-going pattern of conduct, and regardless of pleadings the plaintiff's claims involved a single transaction). Further, the fact that additional incidents alleged in a subsequent action would, by themselves, be insufficient to state a claim, can demonstrate that the claim in the second action is part of the same transaction as the first action. *Id.*

■ The defendants claim *res judicata* applies here because the fundamental basis of all three lawsuits has remained the same—namely that the Congregation's alleged dominance of the Village, its politics and municipal services violates the Establishment Clause. The defendants posit that while the prior two lawsuits addressed different manifestations of the Establishment Clause violation (*Khal Charidim* involved discriminatory zoning enforcement and *Waldman I* involved discrimination in public and private housing), the fundamental premise has remained constant. The defendants also contend that the differences in relief requested in the prior actions do not preclude the operation of *res judicata* because "a party cannot split [a] claim by first seeking one type of remedy in one action and later asking for another type of relief in a second action." *Bloomquist v. Brady,* 894 F.Supp. 108, 115 (W.D.N.Y.1995); *see Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 875 (2d Cir.1991); *Hirschfeld v. Spanakos,* 871 F.Supp. 190, 194 (S.D.N.Y. 1994).

Waldman claims *res judicata* does not preclude this action because: (1) evidence of government entanglement with religion was relevant, but not necessary, to prevail in the prior litigations, (2) conduct offending the Establishment Clause is on-going in the sense that it does not stem from a business transaction or from a series of events that can be extinguished by operation of law, (3) this case relies upon facts that postdate the prior lawsuits, (4) Waldman was not in privity with the plaintiffs in the *Khal Charidim* suit, (5) Waldman proceeded in a different capacity in *Waldman I,* and (6) the *Khal Charidim* settlement does not bind Waldman because the Housing Authority disavowed it. The Court will consider each of these contentions in turn.

Waldman contends that while the facts necessary to prevail on his dissolution claim may have constituted relevant evidence in *Khal Charidim* and *Waldman I,* they were not "necessary" or essential to the adjudication of those prior actions because they each ultimately turned on whether the Village and its agents singled out religious dissidents in the distribution of Village services, not on whether religion was inherently entangled in the Village's operation, the critical inquiry in this case.

This argument is unpersuasive. An essential objective of *res judicata* is to "relieve parties of the cost and vexation of multiple lawsuits, [and to] conserve judicial resources." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The incentive of *res judicata* is to litigate all available claims in one action. Under the rather unusual constellation of facts presented here, Waldman's argument that the evidence was relevant, but not necessary, is at variance with the principal that *res judicata* attaches even if the claims are based upon different legal theories or the complaint seeks different remedies. *See Brooks v. Giuliani,* 84 F.3d 1454, 1463 (2d Cir.1996).

■ The evidence Waldman points to is "not necessary" only because he chose to moderate his pursuit of particular legal theories and particular remedies. These differences should not be permitted to obscure the fact that the same substantial body of evidence and the same core grievance was relevant to all these actions. In other words, Waldman was aware, during the prior actions, of the essential issues and facts asserted in the present case. The importance of, or the weight given to, the evidence in the disposition of prior actions is not controlling as to whether *res judicata* attaches. Were those factors dispositive, *res judicata,* a principle of repose, could easily be frustrated. The case law makes clear that the relevant inquiry is not what evidence was introduced or how aggressively its significance was argued, but whether a particular claim could have been raised in a prior suit. In any event, since the *Waldman I* complaint presented Establishment Clause contentions, it is difficult to see why evidence supporting this

claim in *Waldman I* could properly be denominated as not "necessary" to the action.

The plaintiff also asserts that *res judicata* does not apply because his Establishment Clause claim does not stem from a business agreement or from similar series of events in respect of which the claim may be extinguished by operation of law. Waldman relies on our Circuit's decision in *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86 (2d Cir.1997) which noted:

> [t]o ascertain whether two actions spring from the same 'transaction' or 'claim,' we look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'

*Interoceanica*, 107 F.3d at 90–91 (citing Restatement (Second) of Judgments § 24(b)). *Interoceanica* also stated that "transaction" "must be given a flexible, common-sense construction that recognizes the reality of the situation." *Id.* at 91. Essentially, Waldman contends that because his broad-based dissolution claim in *Waldman II* stems from incidents that span two decades, it is not sufficiently connected in time or space to the prior two cases and traditional *res judicata* principles are inapplicable.

Waldman's assertion is not convincing since courts have consistently applied *res judicata* to claims extending over time or involving seriatim transactions and events so long as they are sufficiently related. *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 638 (2d Cir.1989); *Bloomquist*, 894 F.Supp. at 115; *Yaba*, 961 F.Supp. at 622 (holding plaintiff's second complaint barred because an allegation of hostile work environment includes claims of an ongoing pattern); *see also Woods*, 972 F.2d at 38–39 (holding civil rights act claim barred by *res judicata* because both suits were based on the same factual predicate regardless of any new legal theory).

*Khal Charidim, Waldman I* and *Waldman II* which involved discrimination in zoning, discrimination in the provision of housing, and the existence of a theocracy, respectively, were, if the Court's understanding of *Interoceanica* is correct, a convenient trial unit, and indeed, the facts of these actions are related in time, origin and motivation. Although the three suits have different embellishments of fact, they all originate from the same type of challenged conduct—government sponsored religious discrimination. Also, while the legal theories differ, the motivation by the plaintiffs—the cessation of discrimination in the Village—is the same. The chief participants in the relevant events are the same: the Village, the Congregation, the Village officials and the Housing Authority. Since at a minimum, all three suits would require proof that the Village acts in a discriminatory manner in the provision of services, the claims arise out of the same nucleus of operative facts.

Waldman's contention that *res judicata* does not apply because he relies on facts that post-date the prior lawsuits also is not convincing. As previously noted, the pleading of subsequent acts will not defeat *res judicata* when these additional facts arise from the same core of operative facts. *See Niagara Mohawk Power Corp.*, 873 F.2d at 638; *Yaba*, 961 F.Supp. at 622. Further, Waldman's contention that the action relies on facts that have persisted following the settlement of *Khal Charidim* and *Waldman I* does not hinder the application of *res judicata* because the overwhelming bulk of the evidence remains the same, and the additional facts pertain to the same pattern and practice of unconstitutional discrimination. That these additional facts might be insufficient by themselves to prove an Establishment Clause claim further demonstrates that the claims in the current complaint are interdependent with those of the prior actions. *See Yaba*, 961 F.Supp. at 622.

**380**

 Waldman also claims that *res judicata* does not attach because he was not in privity with the plaintiffs in *Khal Charidim* and he exercised no control over the suit. *Res judicata*, of course, is limited to actions involving the same parties or their privies. *Chase*, 56 F.3d at 346. A privity analysis for *res judicata* purposes is broader than a traditional privity analysis. So whether privity exists is a functional inquiry and not merely a static examination of legal status. *Id.; Alpert's Newspaper Delivery v. New York Times*, 876 F.2d 266, 270 (2d Cir.1989) (Privity is an issue of substance rather than the names in the caption of the case).

Our Circuit has found privity when: (1) a non-party consented to be bound by a settlement agreement, *Tourangeau v. Uniroyal*, 101 F.3d 300, 306 (2d Cir.1996), or (2) a non-party's interests in the prior litigation are virtually identical—i.e. virtual representation, *Chase*, 56 F.3d at 346, or (3) a non-party controlled and financed both suits. *Alpert's Newspaper*, 876 F.2d at 270.

 Here, Waldman consented to a dismissal with prejudice of *Waldman I* pursuant to the settlement of *Khal Charidim* and plaintiffs received, *inter alia*, $300,000. Waldman wrote to his counsel in *Waldman I* stating, "I am satisfied with the terms of the settlement reached in Khal Charidim Kiryas Joel v. Village of Kiryas Joel and understand that one term of that settlement includes dismissal of this action." The Court takes Waldman's statement to his counsel and his counsel's subsequent filing of a stipulation of discontinuance to mean that Waldman consented to be bound by the settlement agreement. This consent allows *res judicata* to apply since a voluntary dismissal with prejudice is an adjudication on the merits. *Chase*, 56 F.3d at 345 (citation omitted).

Waldman also argues that he is not in privity with the plaintiffs in *Waldman I* because he proceeded in a different capaci-

ty. Waldman claims that he acted there in his capacity as leader of a group of dissidents who supported the individual claims, and that he was neither injured nor seeking relief under the Fair Housing Act. The *Waldman I* amended complaint, however, makes no such distinction:

> [D]efendants deprived, and are continuing to deprive, *plaintiff Waldman, individually, and plaintiff Committee, collectively,* of the rights, privileges and immunities secured by the Constitution of the United States, specifically: the right of plaintiffs under the First Amendment, *as taxpayers,* to be free from government funded religious practice, from governmental advancement of religion, and from governmental entanglement with religion.

*Waldman I* Complaint ¶¶ 36, 63 (emphasis added). Considering the representations in the amended complaint which delineated Waldman as both an individual and collective litigant, his claim that he was solely a representative is unsupported by the record.

 Although Waldman was not a named plaintiff in *Khal Charidim*, the record reflects that he participated in the suit in various capacities. During a deposition for *Khal Charidim*, counsel for Khal Charidim stated that Waldman was a member of the congregation and the representative for the congregation. Indeed, Waldman also represented to this Court at a hearing on October 27, 1997,[1] that he was a party representative of Khal Charidim and he sat at the counsel table during proceedings. Further, the plaintiffs in *Khal Charidim* were banished from the founding synagogue. Consequently, Waldman and the plaintiffs in *Khal Charidim* shared very closely aligned, if not identical, interests as dissidents within the Village. These factors lead the Court to conclude that Waldman participated in a representative capacity in *Khal Charidim* and that Khal Charidim had the same interests in litigating the case as did Waldman. Ac-

---

1. *Waldman II* October 27, 1997 Transcript, pages 86–87.

cordingly, *res judicata* applies because "[r]es judicata may bar non-parties to a earlier litigation not only when there was a formal arrangement for representation in, or actual control of, the earlier action but also when the interests involved in the prior litigation are virtually identical to those in the later litigation." *Chase,* 56 F.3d at 345. In any event, Waldman's participation in *Waldman I,* and its subsequent voluntary dismissal with prejudice is sufficient for *res judicata. Id.*

Waldman claims, however, the interests of the plaintiffs in *Khal Charidim* and *Waldman I* are not the same as his in this case because in the prior suits a dissolution of the Village would have hindered their specific objectives of obtaining a place to worship and subsidized housing. All plaintiffs, however, had the incentive to end discrimination and harassment by the Village. Certainly this includes the objective of halting continuing acts of discrimination. Specifically, the settlement agreement in *Khal Charidim* which authorized a payment to the plaintiffs of $300,000, also provided that the Village would no longer discriminate in the provision of services, and that a community relations board would be established to negotiate any future disputes regarding the provision of services. Thus, all parties had the incentive to litigate the actions with the goal of ending religious discrimination in the Village, and to further this goal, created the dispute resolution mechanism. The fact that Waldman now seeks relief that is somewhat different than the relief previously sought does not bar the application of *res judicata. See Sure–Snap,* 948 F.2d at 875 ("A party may not avoid the preclusive effect of res judicata by asserting a new theory or a different remedy.") (citation omitted); *see also Restatement (Second) of Judgments,* §§ 24, 25.

■ Finally, Waldman argues that the *Khal Charidim* settlement does not bind him because the Housing Authority, claiming that it had been improperly named, disavowed it. Apparently, because of a pleading error, the Housing Authority was not properly named in *Waldman I* because Neuman was mistakenly identified and sued as a Village official—the Housing Director of the Village of Kiryas Joel—instead of as the Director of the Housing Authority, an autonomous entity created by state statute. Judge Rakoff held that the Housing Authority was a party neither to *Waldman I* nor to its settlement agreement.

The defendants claim that notwithstanding the absence of a binding final judgment against the Housing Authority, Moses Neuman, Vaad Hakiryah, and its leader Meyer Hirsch, *res judicata* bars litigation against them, not on the theory that these parties were actual named defendants in the prior action, but that *res judicata* is triggered by their "close and significant relationship" to the prior named defendants.

■ *Res judicata* is available to a newly named defendant with a close or significant relationship to a defendant previously sued, when the claims in the new action are essentially the same as those in the prior action and the defendant's existence and participation in the relevant events was known to the plaintiff. *See Gambocz v. Yelencsics,* 468 F.2d 837, 840–842 (3d Cir.1972) (subsequent action barred against co-conspirator when essential allegations of second complaint paralleled those in the first, and sole material change was the addition of certain defendants, some of whom had been named in the original complaint as participants in a conspiracy); *Somerville House Management, Ltd. v. Arts & Entertainment Television Network,* 92 cv 4705, 1993 WL 138736, at *3 (S.D.N.Y. April 28, 1993); *Cahill v. Arthur Andersen & Co.,* 659 F.Supp. 1115, 1121–1123 (S.D.N.Y.1986), *aff'd,* 822 F.2d 14 (2d Cir.1987); *Ruskay v. Jensen,* III, 342 F.Supp. 264, 271 (S.D.N.Y.1972), *aff'd sub nom, Ruskay v. Waddell,* 552 F.2d 392 (2d Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (finding that sufficient relationship existed between

alleged co-conspirators to permit newly named co-conspirators to assert *res judicata* when plaintiffs settled first action fully aware of the newly named defendants' role).

These cases penalize a plaintiff for asserting in a subsequent action the same claim against a co-conspirator whose participation in the plaintiff's prior action was clear, but whom the plaintiff chose not to sue earlier. The courts have reasoned that because co-conspirators were "in privity" with prior defendants they were entitled to *res judicata. See Somerville House Management, Ltd.,* 1993 WL 138736, at *2. As a general rule, privity exists when the interests of a nonparty were adequately represented in the initial action. *Expert Elec., Inc. v. Levine,* 554 F.2d 1227, 1233 (2d Cir.1977). The record does not demonstrate that the interests of the Housing Authority or Vaad Hakiryah were represented by the Village in *Waldman I* such that they can be deemed to have had a sufficiently close relationship so that privity existed. Accordingly, *res judicata* does not apply in the absence of a final judgment touching the Housing Authority, Neuman, Vaad Hakiryah and Hirsch. *See Interoceanica,* 107 F.3d at 90 (citation omitted).

The Village's current trustees, Mittelman, Wertzberger, Kahan and Schwimmer, and the Village Clerk, Szegedin, were not parties in the two prior lawsuits, but are newly added defendants in *Waldman II.* These Village officials are entitled to *res judicata* because government officials sued in their official capacities are generally considered to be in privity with the governmental entity that they serve. *See Micklus v. Greer,* 705 F.2d 314, 317 (8th Cir.1983); *Bloomquist v. Brady,* 894 F.Supp. 108, 114 (W.D.N.Y.1995). Moreover, *res judicata* also bars litigation of Waldman's first claim against the Village officials in their individual capacities. *See Hirschfeld v. Spanakos,* 871 F.Supp. 190, 193 n. 3 (S.D.N.Y.1994). In sum, the Village, and its officials, Weider, Mittel-

man, Wertzberger, Kahan, Schwimmer and Szegedin, in their official as well as individual capacities, are entitled to *res judicata* on Waldman's first claim.

### 2. Standing

Alternatively, the defendants claim that Waldman lacks standing to pursue his Establishment Clause claim against the Vaad Hakiryah, Meyer Hirsch, the Housing Authority, Moses Neuman, and the Village officials in their individual capacities, because he has not alleged any injury in fact and does not allege in his complaint that he is a taxpayer bringing a taxpayer suit. In his brief, however, Waldman now claims that he has municipal and federal taxpayer standing, but as defendants correctly note, "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989).

Since the jurisdiction of federal courts is limited to cases or controversies, standing to sue is essential. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *United States v. City of New York,* 972 F.2d 464, 470 (2d Cir.1992) (citing *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 613, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989)). In order to have standing, a plaintiff must establish: (1) that he personally has suffered some actual or threatened injury as a result of the illegal conduct of the defendant, (2) that the injury fairly can be traced to the challenged action, and (3) that the injury is likely to be redressed by a favorable decision. *Id.* (citations omitted).

Waldman does not allege an injury in fact against the Housing Authority, Vaad Hakiryah, or the Village officials in their individual capacities. For example, there is no contention by Waldman that he applied for or was denied housing in the

Village. In his complaint, in reference to Vaad Hakiryah, Waldman only states that it is "the vehicle by which impermissible entanglement between government and religion is effected." With respect to Hirsch, the leader of Vaad Hakiryah, and the Village trustees and clerk, the only specific allegation in the complaint regarding their conduct pertains to extortion in the provision of building and sewer permits. But Waldman does not allege that he was extorted or forced to make donations to the Congregation.

Waldman states in his brief, however, that he need not allege that the defendants personally injured him because he has municipal and federal taxpayer standing. *See Flast v. Cohen,* 392 U.S. 83, 102–103, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Board of Educ. of Mt. Sinai Union Free School Dist. v. New York State Teachers Retirement System,* 60 F.3d 106, 110 (2d Cir. 1995); *see also Frothingham v. Mellon,* 262 U.S. 447, 486, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (resident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation). This contention will not now be resolved in the absence of properly plead allegations in the complaint of taxpayer standing. Leave is given to amend with respect to this omission in the complaint within 14 days. *See* Fed. R.Civ.P. Rule 15. The Village officials in their individual capacities, the Housing Authority and Neuman, and Vaad Hakiryah and Hirsch, are, however, otherwise entitled to dismissal of Waldman's first claim for lack of standing because the complaint fails to allege the requisite injury.

## CONCLUSION

For the reasons stated above, the motion to dismiss Waldman's first claim based on *res judicata* is granted as to the Village, and its officials, in their official and individual capacities. The Housing Authority, Neuman, Vaad Hakiryah and Hirsch are entitled to the dismissal of the first claim due to lack of standing. The parties shall appear for a conference pursuant to Fed.R.Civ.P. Rule 16 on March 19, 1999, at 9:30 a.m.